## Nace *versus* Boyer *et al.*

So long as a contract continues executory, it may not only be impeached for fraud or mistake, but any invalidity which would be a defence at law, would, in general, be ground for cancellation in equity.

But a contract already executed cannot be set aside as illegal or immoral; nothing but fraud or palpable mistake is ground for rescinding an executed conveyance.

One of the recognised grounds for decreeing the cancellation of an executed contract is, that species of fraud which practices on a weak intellect to obtain an unconscionable bargain.

But the mere fact that a person is of a weak understanding, whether produced by old age, accident, or disease, if there be no fraud or surprise, is not an adequate ground of relief.

The mere fact that a contract is improvident, is no ground for setting it aside.

APPEAL IN EQUITY from the Common Pleas of *Montgomery county*.

This was a bill in equity by Philip Nace against John Boyer and Thomas Shull for the rescission of an executed conveyance, alleged to have been obtained from him by fraud and unfair practices.

The bill set forth that on the 29th October 1853, the complainant executed a conveyance of all his estate real and personal, unto the defendants and his son Tobias Nace, in trust, first to pay his debts, and then to invest the residue of the estate, and thereout, after paying the expenses of the trust, to support and maintain the complainant during his natural life, and at his decease divide the same equally among his children. That Tobias Nace on the 21st August 1854, was dismissed from the trust. That the other trustees, the defendants, are the sons-in-law of the complainant,

[Nace *v.* Boyer *et al.*]

in whom he placed the most unlimited confidence.  That the said defendants abused the confidence so reposed in them, and by fraud and deception obtained his signature to the said conveyance.  That he executed the same under an entire misapprehension on his part as to the nature and effect of the same, and without a proper knowledge and understanding of its contents ; the same not having been read and explained to him as it should have been.

That the allegations contained in the recitals of the said instrument were untrue, except as to his indebtedness, which, in point of fact, only amounted to $1550, whilst he had an estate worth about $8000 to pay the same with.  That his son, Tobias, was not then aware of the effect of the said deed, and had since repudiated the whole affair.  That complainant had an idiotic son, wholly unprovided for ; and that by the said deed he had deprived himself of the means of supporting his said child ; complainant being sixtynine years of age and unable to earn a livelihood for the subsistence of his said child.  He therefore prayed that the said instrument might be declared to be null and void, &c.

The defendants, by their answer, denied all fraud or unfair dealing in obtaining the deed in question, and alleged that the same was executed with the full knowledge on the part of the complainant of its effect, that it was dictated by himself and read over and explained to him ; and that he was fully warned of the consequences of what he was about to do.  That they had no knowledge that they were to be named as trustees until the time of its execution, and would not have acted had they believed the same was not executed voluntarily.

To this the general replication was filed ; and a great mass of testimony was taken before the examiner by both parties, the result of which is fully stated in the opinions delivered in the court below and in this court.

The court below (Smyser, P. J.,) after hearing, dismissed the bill, and delivered the following opinion :—

" I have looked into the bill, answer, and testimony in this case, predisposed to grant the prayer of the bill, if there appeared to be any reasonable grounds for supposing that the deed in question was unfairly or unduly obtained.

" The principles applicable to cases of this kind are well settled and understood.

" In all cases of actual fraud, the conveyance is void both at law and equity.  So in all cases of duress, either of the body or of the mind and will.  So, also, where there is such defect of mental capacity and understanding as indicates the absence of a disposing mind and memory.  In all these cases, the instrument is avoided without reference to the question whether the settlement is a reasonable or unreasonable one, or the bargain conscionable or otherwise ; neither is it necessary to show circumvention, undue influ-

[Nace *v.* Boyer *et al.*]

ence, ignorance, or surprise, except so far as they shed·collateral light on the main inquiry.

"There may, however, be cases of weakness of understanding and feebleness of intellect, but inferior to that sort and degree of imbecility which would warrant a jury in finding a man to be insane, or *non compos mentis*, or lunatic. In all such cases, so long as a man is legally *compos mentis*, he is not the subject of equitable protection in his contracts or settlements, unless he has been the subject of surprise, undue influence, deceit, or something equivalent thereto. Otherwise, his will is a sufficient reason in equity as well as law, whatever courts of equity may think of the wisdom of its exercise. With that we have nothing to do, save as an unwise, unusual, or unconscionable bargain or arrangement may go, in aid of other circumstances, to establish an unfair tampering with, and practice upon, a weak intellect.

"But if a weak mind, yet legally *compos mentis*, has been drawn into a bargain by the influence of falsehood and deceit— if one who, by reason of his feeble understanding, is liable to imposition, has been circumvented by cunning, operated upon by artifice, or overcome by undue influence and importunity—if advantage has been taken of a situation of extreme distress or necessity, to obtain some unfair advantage—if the grantor has been importunately pressed, so that an opportunity was not afforded him to act deliberately and understandingly—if he acts under the influence of strong and urgent persuasions from those in whom he reposes special confidence, or who stand towards him in some special relation of trust and confidence—if he was taken by surprise, and he had no opportunity afforded him for suitable deliberation, or such surprise was accompanied by circumvention and fraud, or some contrivance and management to mislead him—if, in a sudden emergency, the opportunity to consult with counsel or friends is denied him—in all these, and many analogous cases, a court of equity will interpose for his relief on the ground of *constructive*, where the circumstances do not amount to *actual* fraud.

"Does the testimony in this case make out *incapacity* such as would amount to disability *per se*, or *fraud* either actual or constructive? If either one of these questions can be answered affirmatively, the plaintiff will be entitled to the relief prayed for. If all are answered in the negative, the bill must be dismissed.

"As to the first question—had Philip Nace, Sr., sufficient mental capacity to make a will or deed at the time of this conveyance?

"The presumption always is in favour of capacity. That casts the *onus* of showing *incapacity* on those who allege it.

"Here, I think, the preponderance of proof is greatly in favour of the defendants. Six witnesses, to wit: Henry Krieble, Henry Weishley, John Nice, Michael Nace, Tobias Nace, and Sarah Nace (the three last being children of complainant), testify to his inca-

[Nace *v.* Boyer *et al.*]

pacity. On the other hand eleven, to wit: Frederick K. Smith, John H. Kaull, George Nace, Wm. Gorgas, John Haag, John Hartranft, Jesse Hildebitle, Jacob Kraft, Jacob C. Moyer, Elias Barndt (a son-in-law), and Philip Nace, Jr. (son of plaintiff), testify with more or less directness, positiveness, and circumstantiality, to his sanity and competency to do the act in question. After making every allowance and abatement on account of the different degrees of knowledge and opportunities for acquiring it on the part of the witnesses on both sides, I think the balance still remains as originally inclined. The testimony of his son Philip, with whom he lived before, at the time of, and after the conveyance, and of his hired man John Haag, is entitled to special consideration, on account of their superior and constant opportunities of observing the state of his mind and conduct. Nor is the testimony on this point of Esquire Smith, corroborated strongly as it is by that of Philip Nace, Jr., Jacob Kraft and others, as to the circumstances of his conduct immediately preceding and at the time of the conveyance, of less importance. The attempted impeachment of Squire Smith, by the testimony of Krieble and Weishley as to the declaration of the former on the 8th of May, I do not think entitled to much consideration. 1st. It is more likely that these witnesses misapprehended Squire Smith's remark, as stated by himself, than that the latter should have made a statement so utterly at variance not only with his sworn testimony, and after, too, he had been subpœnaed to give that very testimony, but with all his previous conduct and his known and acknowledged character as an upright magistrate and a man of probity. 2d. These witnesses do not agree as to Squire Smith's words, and the same witness varies in each repetition of his statement. Such looseness of recollection may well co-exist with an original misunderstanding. 3d. The testimony of Squire Smith, on the stand under oath, whatever he may have said at any other time, is fully corroborated in every leading and important fact stated, by Messrs. Kraft, Philip Nace, Jr., Brandt, and others, who are unimpeached, and must, therefore, be taken as that of a truthful witness; especially as no corrupt motive, on his part, to falsify, is shown or even suggested. I readily concede, on the other hand, that great respect is due to the knowledge and opinions, on this point, of the daughter and two sons, who have testified against the capacity of their father. Were it necessary, it might be worth while to consider how far the expectation of favour at his hands, in the final disposition of his estate, should he succeed by their aid in getting it again into his own control, may have insensibly influenced their opinions; and such an influence might well be set off against any interest which the son and son-in-law, who testify on the other side, have in upholding this deed; which, after all, only give them such an interest as would be theirs in case of intestacy. It might be

profitable, too, to inquire how it was that Tobias Nace, who now alleges his father's incapacity, was, according to his own testimony, found bargaining with him for the purchase of a portion of his real estate at the very time he now alleges this incapacity to have . existed.   Also, how it happened that on neither of the two Saturdays, when the old man had gathered his children around him for the very purpose of effecting this arrangement, and when the family was all assembled, and when some of those present were averse to the proposed arrangement, that no one, not even Tobias or Michael, then suggested their father's incapacity to the scrivener, or among themselves, or to anybody.

"Again, was he *non compos mentis* also, when, in the spring of 1853, he spoke to Mr. Kaull of a similar disposition of his property, which he then contemplated?   Kaull says, positively, that he was not; and the consistency of the act, done with a similar one meditated at a time of acknowledged sanity, is strong evidence that he was not insane at the time he did it.

"And a like argument might be based on the facts of his calling on Squire Smith five or six weeks previously for the same purpose, his returning again at the time appointed, and his intelligent and consistent statement of his plans and wishes then.

"If mad, surely there was method in his madness.   So far from the testimony repelling the original presumption in favour of capacity, I think it fortifies and strengthens it.

"But was there any fraud practised or undue influence exerted?

"1. As to the fraud.   It seems to me, unless we totally reject the evidence of Philip Nace, Kaull, Smith, and Kraft, that this is out of the question.   On the contrary, uncommon pains would seem to have been taken that he should fully understand what he was about to do, and its effects; and more than ordinary time for deliberation afforded.   As early as the spring preceding, we find him broaching the same plan to Mr. Kaull, who then suggested to him that he had better (to use his own expression) 'keep the reins in his own hands.'   The old man, however, persisted, and gave his reasons, which, whether conclusive or not to the wisdom of the course contemplated, certainly furnished no evidence either of insanity or unfair practice.   And it is to be remembered that there is no evidence to show, at that time, any of his sons or sons-in-law had been trying to persuade him to part with his property, or even spoken on the subject.   The idea was his own, and the spontaneous product of his own mind; nor, however ill-advised the step, is it one of so uncommon a character or unusual occurrence as to require us, without proof, to presume fraud, circumvention, or unfair practice upon his mind.   Whether we may think it wise or unwise for a man to take off his clothes before he is ready to go to bed, we know of many instances in which men, feeling the approach of age with its infirmities, finding memory

[Nace *v.* Boyer *et al.*]

failing, or physical strength declining, and the cares of business a burthen, have made over their property to their children—reserving a support, and relying on their gratitude and filial duty and affection that such support will be fairly rendered. This forms a good consideration for a conveyance; nor does the subsequent failure of duty on the part of the child, form a ground upon which to avoid the deed, but the grantor must pursue his remedy on his contract or covenants.

"In September following, we find him calling on Squire Smith, to procure his services as scrivener to carry out this idea. Owing to sickness in Smith's family, the matter was postponed; and after a week or two the old man calls again, according to appointment, and arranges for a meeting of the family, together with the scrivener, on the following Saturday. Most of them assemble, and they wait from 1 o'clock until 8 for Tobias, who not coming, the matter is again postponed, and another meeting arranged for the following Saturday. In the meantime, the old man had furnished Smith with his instructions, who took a memorandum of them. On the day of final meeting, Smith testifies that he advised against the measure in the presence of the old man and his children, and afterwards took the old man aside and endeavoured to dissuade him from it—representing the ill effects that might ensue, and referring to difficulties that had arisen in a similar case. The old gentleman, however, was firm in his purpose. The members of the family, too, said he was forgetful, and the arrangement had best be made as he wanted it; and it was made. The old man produced his deeds, sat by the scrivener, and gave him directions. The original memorandum was read over and explained; the deed was read, part by part, as it progressed, and afterwards entire when completed; and its contents, nature, and effect, elaborately explained. This was done again and again, in English and in German. The deed was then executed; appraisers were sent for; the old man produced his papers, notes, bonds, &c., and an inventory was made.

"Now, surely, if we assume that the old gentleman had mind enough to comprehend what was said and done, it would be difficult to imagine what more could have been done to stamp a character of entire fairness on the transaction. There was nothing hurried—nothing precipitated: for weeks intervened between the first agitation and the final completion of the matter. The family all notified and assembled, and a postponement of a week in consequence of the absence of the very member of it who now is chiefly relied on to impeach this deed; and the scrivener, the agent by whom this act of fraud on the old man was to have been consummated, and who, I suppose, will not be suspected of complicity, selected, not by the concocters, but by the intended victim of the fraud. Surely never was meditated fraud more awkwardly

[Nace *v.* Boyer *et al.*]

concocted.   The general rule is, that a party executing a deed is presumed to know its contents; and where there are no suspicious circumstances to influence it, the rule is that the burthen of proof is on him who seeks to impeach a legal instrument.   Here, however, the defendants, if the testimony is believed, have on their part strongly fortified the presumption.

"What is there to inspire disbelief?   The qualified, and, in some degree, negative testimony of the appraisers (who were only called in late in the day), and of Tobias Nace, who says that he can't recollect that Smith read or explained the deed in German; surely, on no principle of the law of evidence, can it be permitted to prevail against the positive testimony of the man who did it, corroborated by the testimony of at least three credible witnesses, one, at least, of whom is beyond all suspicion of interest or bias.   It seems to me that the allegation of the bill, that the plaintiff was fraudulently circumvented into signing this deed, in utter ignorance of its contents or effect, is fully disproved by the testimony.   The very reason repeatedly given by him for desiring to make this arrangement, to wit, that then he would have no further trouble in taking care of his estate, disproves his present allegation, that he did not know, when he signed the deed, that *its* effect would be to take the management of his property out of his hands.

"But it is said he was *persuaded* by his sons-in-law, the defendants, to make this deed.

"Suppose he was.   Mere pursuasion, unaccompanied by any fraud, deceit, or duress, operating on a mind *sui compos*, and where there is nothing so unconscionable in the bargain itself as to shock the moral sense, is no ground for avoiding a deed.   I grant that, where the bargain is an unconscionable one, such persuasion operating on a mind weak and enfeebled, or depressed, although legally *sui compos*, will be laid hold of by courts of equity to relieve a party from his own contract.

"But, conceding that the mind of old Philip Nace was weakened for the time, in this sense, by reason of his family difficulties, is there anything in this family arrangement which ought to induce us to desire to avoid it on this ground?

"Was there strong persuasion, in the language of Judge Story, used by those in whom he placed confidence, as there is very great unfairness or inequality in the bargain made?

"No one can read the testimony of Jonas Wenholt, who speaks of the persuasion used at Moyer's sale, without seeing an evident, although doubtless unconscious, disposition to exaggerate and magnify things in favour of the complainant.   He says the way they were working on the old man at the sale, was enough to set a sane man crazy; and yet he did not hear a word of what was said, nor does he know what they were talking about.   He saw, but did not hear.

[Nace *v.* Boyer *et al.*]

"The language used by Mr. Scholl, after the deed was made, must be interpreted in view of the fact that it was the ebullition of a mind not, perhaps, very fastidious or refined in its conceptions or expressions, and doubtless experiencing a feeling of gratification at the completion of an arrangement deemed necessary or desirable for the interest of all concerned.

"But how is the arrangement an unconscionable one? It is not a bargain and sale between strangers, but a family arrangement between a father and his children, by which the former, perhaps imprudently anticipating the course of nature, places in their hands that which, sooner or later, would be theirs at any rate, in consideration of a maintenance and support free from all further worldly care, responsibility, or trouble.

"There is no proof before me, that in this respect the consideration has failed, or that the trustees have neglected or refused to provide for him properly.

"From the statements. made on the argument, and the facts appearing in evidence, it is apparent that the income of his estate in the hands of his trustees, will be about $400; amply sufficient for all his reasonable wants and comforts. True, instead of paying the annual income into his own hands, the trustees are to administer and apply it; but they are bound to apply the whole of it for that purpose, if necessary, or required by his wants and necessities; and in case of failure or refusal to do so, chancery would compel them to it. The deed, therefore, does in effect secure to him the entire income, or so much thereof as, in equity and fair dealing, according to the spirit of the instrument, ought to be so applied; and if, in consideration of ease, freedom from care and responsibility, and an easy and comfortable living, he chose, after weeks and months of deliberation, to forego his control over the principal, it was for himself only to measure the advantages with the disadvantages of such a course to himself.

"Neither can I see that this bargain ought to be deemed an unconscionable one, or as furnishing any internal evidence of fraud, because it contains no provision for the benefit of the son, Paul, who is represented as *non compos mentis*.

"So far as the absence of any provision for his support during the lifetime of his father, is concerned, the law takes sufficient care of that. The 28th section of the Act of 13th of June 1836, makes the parent liable in his estate for the support of a child unable to work or maintain himself. Nor do I suppose that any voluntary conveyance by a father of his estate to trustees, for the exclusive benefit of himself and his family, could divest either him or the estate of that liability. The family arrangement, therefore, leaves the matter just where the law placed it before; and it can only be said, at worst, that the grantor has tied his hands from doing any acts of mere benevolence; which, for his own

ease and comfort, his selfish ease and comfort if you please, he had an undoubted right to do; and which he might do, *proprio motu*, without any fraud or undue influence.

"Then, as· to the absence of any provision giving this imbecile son a larger share than the other children, in the final distribution. He gives to him an equal share with the others; precisely what the law would have assigned to him in case of intestacy. Is this so unusual? Have we not wills on our own records now, in which an equal share and no more is given by trustees of undoubted capacity to their lunatic children, with no special provision in their favour save providing for the care of the fund in the hands of trustee? Suppose old Philip Nace were now dead, having made his will, giving this son only an equal share with his other children. Would any one be heard who sought to impeach his will on this ground? Surely not. On an issue of *devisavit vel non*, would it weigh a feather with a jury? It may be that such a child, being more helpless, may stand in need of a larger share, and such a consideration, operating on a parent's mind, would fully warrant and justify such a discrimination in his favour. But must a man make it, on peril of having his will set aside? It is sometimes said that the law makes the best will. Shall a man's sanity or competency to make a will be impeached because he has not undertaken to be wiser than the law itself?

"On the whole, after the most careful consideration I have been able to give the evidence in this case, I am of opinion that it fails to establish the allegations of the bill, or furnish any ground for the interposition of a court of equity.

"Was there any oppression? On the contrary, he was left free to act, and he took his own time for it.

"Was there any fraudulent advantage taken or imposition practised? So far from it, that everything was done that could be done to possess him fully with the nature and consequences of the act he was about to do.

"Was proper time afforded? Surely so, if weeks and months are sufficient.

"Did he act improvidently? No; for he was cautioned, advised, and fully informed.

"Was he importunately pressed? The evidence is very slight to show that he was pressed at all; certainly not very importunately. In fact, he conceived and meditated this very step before there is any evidence that he was pressed at all by any one.

"Was he suddenly drawn to act, without being aware of the consequences, or having an opportunity to consult counsel or friends? On the contrary, he took his own time to act, and consulted with whom he pleased, and had the benefit of the advice of disinterested persons whom he did consult.

"Was he of disposing mind and memory? The preponderance of the evidence is that he .was.

[Nace *v.* Boyer *et al.*]

"I cannot, therefore, grant the complainant the relief the bill seeks; but the same is refused, and the prayer of the bill disallowed."

From this decree the complainant appealed; and, after argument in this court, at January Term 1857, by *Krause* and *Boyd*, for the appellant, and by *Boyer* and *Chain*, for the appellees, the following order was made:—

Lowrie, J.—One of the four judges of this court who heard this cause, having resigned before we had finished our consultations upon it, and the case being somewhat strange in its features, we think it proper that it should be argued again. There is another reason for taking this course. The equitable owners of the property, under the deed sought to be set aside, are necessary parties to the suit, and it is not sufficient to make the trustees defendants. It is, therefore, impossible for us to decide the case on the merits. It is plain enough that all the real parties have been represented under the name of the trustees, but this is not sufficient; they must be parties on the record. Those who are interested only as creditors are properly represented by the trustees, but the equitable owners are not.

Considering that proceedings in this form are yet quite unusual in some parts of the state, and that all the testimony has been taken, and the other proceedings had, as if the beneficiaries were parties, we have concluded that we are not bound to follow the usual equity practice, and dismiss this bill for the defect specified, but that we may grant an indulgence, even at this late stage of the case, that will enable the plaintiffs to amend, by making the *cestuis que trust* parties, plaintiffs or defendants.

This can be done by amendment of the bill, and, if necessary, a new subpœna for the new parties. It will save much expense and trouble, if they will agree that the old testimony stand, and they can add what they think necessary. Then the cause having been decided again by the Common Pleas, will be ready for review by us. In order that the case may be corrected, as well as the parties are able, we reverse the decree.

The decree of the Common Pleas is reversed, and the record remitted for amendment, by making the *cestuis que trust* parties, and for further proceedings.

When the cause came back into the Common Pleas, that court, on the 9th October 1857, upon application of the complainant, allowed the bill to be amended by making all the *cestuis que trust* parties defendants; and also by the complainant charging in more direct and explicit terms, "that just before and at the time it is alleged that he executed said deed or instrument of writing, he was not in a state of mind to do so; but was, by reason of trouble

[Nace v. Boyer et al.]

and other causes, over which he had no control, wholly unfit to execute such instrument; and was, as he is informed and believes, at the time, labouring under partial, if not entire insanity; but had, at the time of filing said bill, entirely recovered."

The *cestuis que trust* were all regularly brought in, and answered the bill; two of them, Tobias and Michael Nace, asking the court to decree in favour of the complainant, and the others opposing such a decree, and denying the material allegations of the bill. Some additional testimony was taken on both sides; and on the 3d December 1857, the case came on again for hearing, in the court below; when it was decreed that the complainant's prayer for relief be refused, and the bill dismissed; the costs to be paid by the trustees out of the estate. From this last decree the complainant again appealed to this court.

*Krause* and *Boyd*, for the appellant.—The evidence fully establishes the want of mental capacity of the appellant, at the time of the execution of the conveyance of his entire estate. From such an unconscionable contract a court of equity will relieve: 1 *Story's Equity*, pp. 234-40, 307, 312, 331-2, 334, 336-7; Boyd v. Eby, 8 *Watts* 66; Grabill v. Barr, 5 *Barr* 442; McTaggart v. Thompson, 2 *Harris* 149; Huguenin v. Baseley, 14 *Ves. Jr.* 273; Davenport v. Cole, 2 *Halst. Ch.* 522.

*Boyd* and *Chain*, for the appellees.—The deed was not executed by the complainant in haste, but after months of deliberation, and much consultation with his kindred and friends. The act was altogether his own; and the evidence shows that the conception of it originated entirely with himself.

It is not deemed necessary to cite authorities in support of the obvious legal principles which must govern this case. The questions involved are questions of fact. The case of Huguenin v. Baseley, 14 *Ves.* 273, has not any application to the matter in hand. That was a case arising from a voluntary settlement by a widow upon her agent, who had the management of her affairs; and was decided upon the principles of public policy applicable to the relation of guardian and ward. Here the trustees had no previous agency, and did not before the deed of assignment stand towards the assignor in any fiduciary character whatsoever.

Neither was this trust of their own seeking; but having been thrown upon them it has become their duty to support it.

The opinion of the court was delivered by

WOODWARD, J.—The ground upon which courts of equity proceed in rescinding or cancelling executed contracts, is much more narrow and to be more carefully trodden than that upon which they refuse specific performance of unexecuted contracts, or even decree them to cancellation.

`[Nace *v.* Boyer *et al.*]`

Nothing but fraud or palpable mistake is ground for rescinding an executed conveyance. So long as the contract continues executory, it may not only be impeached for fraud or mistake, but any invalidity which would be a defence at law, would, in general, be ground for cancellation in equity; as, for instance, the illegality of contracts for gaming or smuggling, for inducing or aiding prostitution, for compounding a felony, or for paying usury. But a contract already executed cannot be set aside as illegal or immoral. A contract made on Sunday would not be enforced either at law or equity, and might, whilst it remained executory, be decreed to cancellation, however distinct and fair in its terms, but would not be set aside after the parties had themselves executed it : 3 *Casey* 90.

One of the recognised grounds for decreeing the cancellation of an executed contract is, that species of fraud which practices on a weak intellect to obtain an unconscionable bargain. It is not necessary that the imbecility should be utter, such as renders a man legally *non compos*. A conveyance may be impeached for mere feebleness of intellect, provided it be coupled with other circumstances to show that the weakness, such as it was, has been taken advantage of by the other party. But the mere fact that a person is of weak understanding, whether produced by old age, accident or disease, if there be no fraud or surprise, is not an adequate cause of relief : *Adams' Equity* 183 ; Blachford *v.* Christian, 1 *Knapp* 73.

Judge Story, in his work on Equity Jurisprudence, vol. i. pl. 238, after quoting with approbation Lord Wynford's judgment in the last cited case, sums up the authorities by saying " the doctrine may be laid down as generally true that the acts and contracts of persons who are of weak understandings, and who are thereby liable to impositions, will be held void in courts of equity if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overcome by cunning or undue influence." In Beals *v.* See, 10 *Barr* 56, this court held that an executed contract by a merchant for the purchase of goods, could not be avoided by proof of insanity at the time of the purchase, unless a fraud was committed on him by the vendor, or he had knowledge of his condition.

And the mere fact that a contract is improvident, is no ground for setting it aside : Green *v.* Thompson, 2 *Ired. Ch.* 365. Nor is inadequacy of price by itself ground of rescission : Osgood *v.* Franklin, 2 *Johns. Ch.* 1. " An unexecuted contract," said BLACK, C. J., in Davidson *v.* Little, 10 *H.* 251, " has been often annulled, or the vendee left to his action at law when there was no proof of foul practice, except inequality between the price

[Nace *v.* Boyer *et al.*]

agreed on and the thing sold. But inadequacy alone must be rejected as insufficient to justify the cancellation of a conveyance. Inadequacy of price is not fraud."

To approach now the case in hand. The appellant asks that his deed of 29th October 1853, be declared null and void on the ground that it was obtained from him by fraud.

If the principles stated, and the authorities referred to above be taken as expressing the mind of the law, it is evident that the fraud is not to be regarded as proved, and the deed declared null, on the ground of such age and imbecility of mind as are alleged, nor on the ground of inadequacy of consideration or improvidence in the contract, but that we must look for evidence of surprise or imposition practised on him.

Men of greater age do habitually make valid deeds and wills. In Lewis *v.* Pead, 1 *Vesey, Jr.* 20, BULLER, J., sitting for the Lord Chancellor, ruled that he would not presume imposition from the age of a lady near 75, who had made an improvident lease, and in saying, " we have seen the greatest abilities displayed at a greater age than 75," he is supposed to have intended a tribute to Lord MANSFIELD, by whose side he had long sat in the King's Bench, and who had resigned only the year before at 84 years of age.

Nor does the age of the plaintiff, about 70, in connexion with the evidence of feebleness of understanding, make out a case of fraud. The attempt on his own life, some ten years before the deed, would indicate positive insanity, but the evidence proves abundantly his recovery from that condition. The witnesses differ very much in their estimate of his intellect, some of them thinking him competent to contract, and others incompetent, but the case presented is not one of mental derangement at the time the deed was executed, nor of absolute imbecility, but of weakness of intellect from old age, and trouble. He himself recites in his deed that from " disadvantageous bargains and undertakings, considerable losses and indebtedness, and old age and feebleness, he has become so much troubled in mind as to be unable of attending to business," which I presume may be safely assumed as a fair exhibition of his mental condition. Unable to attend to business, but not necessarily unable to make a valid conveyance to trustees for the benefit of himself and children, and yet so far impaired in mind as to be more easily imposed· upon, circumvented, and overcome by cunning and undue influence than if adverse circumstances had not reduced the natural vigour of his intellect.

As to the improvidence of the deed, no more can be alleged than could be said of very many similar conveyances that have been made in Pennsylvania, and never questioned, or if questioned, not overthrown. All such dispositions of property are violations of those maxims of prudence that enjoin a man, whilst

[Nace *v.* Boyer *et al.*]

he has breath in his body, to keep the staff in his own hands, and not to divide his substance among his children till he come to die. Still they are common, and this one is as well guarded as they usually are. It conveys to his chosen trustees his whole estate, real and personal, to convert into money—out of the proceeds to pay his debts, and carefully to preserve the residue by investments in real estate—to apply the interest to his maintenance and support for life, and after his death to divide all that remains among his nine children, share and share alike. He thought, and so declared in the deed, that this arrangement will "spare me much care and trouble, and save me from further losses, and the destruction of my property." An instrument founded in such reasons, and so much in accordance with family arrangements in Pennsylvania, though it may not be sanctioned by the highest prudence, cannot be considered so improvident as to prove either imbecility or imposition. His son Paul was *non compos mentis*, and it is thought a sign of the father's imbecility that he did not provide specially for him. He probably thought Paul would be taken care of by his brothers as he had been, and that an equal share of the estate after his death would compensate for Paul's support. And this was not an unreasonable expectation.

On the whole it is impossible to see, either in the deed or in the condition of the grantor, such evidence of fraud as would justify us in setting it aside. The material inquiry then is, was it executed without such deliberation and under such undue influences as would amount to fraudulent practice?

The testimony, especially that of Kaull and Smith, shows that the old man was contemplating such a disposition of his property some time before he made it, as early even as the spring before, and that he had been conversing with his children and neighbours on the subject.

The counsel for the plaintiff rely chiefly on the testimony of Jonas Wenholt and Michael Nace, for proof of undue influence. These witnesses describe an interview between the old man and his sons and sons-in-law, at a vendue, in the fall of 1853, sometime before the deed was executed. Wenholt characterizes the scene strongly. He says, the "old man stood there hanging his head—the way they had the old man there was enough to make a sane man mad." But he admits that he stood off twenty-five steps, and did not hear what was said, though he saw Boyer and Scholl standing before the old man, and making "great motions with their hands." From Michael Nace we learn what was said at this interview: "Boyer and Scholl said to the old man that he should give his property out of his hands, and they would take it in hand, and loan out his money, and would not charge any commissions unless where money was standing out, and there was danger of its being lost; it would relieve him from trouble, live

[Nace v. Boyer *et al.*]

easy, live around with his children or elsewhere, and they would pay him. They then asked if they were all agreed to it? and they said they were, except myself; and I do so far agree to it that if they would keep father well I wouldn't say anything about it, but I rued it before I got home."

It would seem that the object of this interview was rather to persuade the sons than the old man of the fitness of the proposed measure. One of the sources of his trouble was, that the boys would not agree among themselves what was best to be done, and a subsequent meeting was appointed for Saturday following the vendue, when most of them again met at the father's house, and discussed the subject, but adjourned to the next Saturday, without executing any writings.

It was at the second Saturday meeting the affair was consummated.

An old man, with numerous sons and sons-in-law around him—anxious to divest himself of the trouble and vexation which his property and debts occasioned him—but most anxious to make his arrangements satisfactory to his children—meets with them in frequent interviews to discuss the subject, and finally, after long deliberation, makes the deed in question, whereby he provides for his creditors and his own support for life, and then divides his estate equally among his children—such is the case presented by this record. Is it a case of fraud? The disposition made is exactly that which the law of the land would have made, if it had taken the property out of the old man's hands.

Be it that Boyer and Scholl advised the arrangement; advice, or even persuasion to make a deed or will in a particular way, is not fraudulent. There must be something more, something that amounts to imposition or circumvention—a species of moral constraint, that takes away the free agency of the party, before his deed or will can be set aside.

We have looked through this evidence again and again, without finding such proof. With a strong dislike of such arrangements in general we came to the investigation, predisposed to relieve the plaintiff from the deed of which he complains, but have failed, after the most patient consideration, to find such proofs as would justify us in doing so. The sons had a right to advise him. It was their duty to counsel him, and it does not appear that they took advantage of his infirmities to secure special benefits to themselves, or that they gave any other than such advice as they conscientiously believed the occasion demanded.

These observations dispose of the case made by the bill. Whether the deed be not a revocable instrument is a question which is not raised upon the record, and which we do not decide.

The decree dismissing the bill is affirmed.