### KILGORE *v.* CROSS & DIVER.

*(Circuit Court, E. D. Arkansas.  ———, 1880.)*

CONTRACT—MENTAL CONDITION.—Facts upon which it was held the mental condition of a party was such as to incapacitate him to enter into a valid contract.

SAME—IMPOSITION—EQUITABLE RELIEF.—Against the consequences of mistaken judgment, or mere imprudence and folly on the part of one making a contract, courts can grant no relief. But the acts and contracts of persons who are of weak understanding, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justifies the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overcome by cunning artifice or undue influence.

SAME—EXERCISE OF REASONING FACULTIES.—A party is not barred by a contract entered into when his mental condition is such as to preclude any fair or reasonable exercise of the reasoning faculties.

SAME—INCAPACITY—EXPERT TESTIMONY.—Opinions of witnesses not experts are competent evidence on the question of capacity or incapacity to make a contract, when the facts or circumstances are disclosed on which they found their opinions.

CALDWELL, J.  The plaintiff was the owner, among other property, of five head of horses, two sets of double harness, and one Concord eight-seat stage coach or wagon. He desired to sell or exchange this property, and having been informed that Cross & Diver, the defendants, had obtained a contract for carrying the United States mail, and were running a street railway in Little Rock, and that they would probably purchase the property, he caused inquiry to be made of them on the subject and received an answer, in substance, that if he would bring his property from Hot Springs, where plaintiff then was, to Little Rock, they might purchase or trade for it. Encouraged to believe that he could dispose of his property to the defendants, the plaintiff, on the fourteenth day of July, 1878, started from Hot Springs to Little Rock with his stage

coach, drawn by four horses, himself driving. In or near Hot Springs the horses drawing the coach took fright, ran away and overturned the coach, seriously injuring the plaintiff. The extent and character of this injury is the turning point in this case and will be more fully considered hereafter.

On the next day after he received his injury the plaintiff directed one of his hired men to take his coach and five horses to Little Rock and sell or trade them at his discretion, and on the sixteenth of July his hired man proceeded to Little Rock with the property upon the understanding that he was to sell or dispose of the same for the plaintiff according to his own discretion, unless the plaintiff should, himself, go to Little Rock by rail the next day.

On the seventeenth of July the stock and coach arrived at Little Rock, and were put up at defendants' stable, and in the afternoon of the same day the plaintiff arrived by rail. The next day the plaintiff and defendants effected an exchange of property, as follows: the plaintiff gave the defendants his five horses, two sets of harness, and stage coach and $150, for an old glass front Clarence carriage. The $150 was not paid in money, but the plaintiff gave his notes for that sum; and, to secure its payment, executed to defendants a mortgage on the carriage. The defendants loaned plaintiff a span of horses to haul the carriage which he received in the trade to Hot Springs, and it was driven to the latter place by the plaintiff's hired man.

The plaintiff arrived at Hot Springs with the carriage on the nineteenth or twentieth of July, and within a week thereafter returned to Little Rock with the carriage, and tendered it back to the defendants and demanded a return of the property which they had received from him for the carriage, upon the ground that at the time he made the trade he was *non compos mentis*.

The defendants refused to rescind the trade, and thereupon the plaintiff filed his bill, alleging that by reason of the injury plaintiff received when thrown from his coach he was, at the time of the trade, incapable of transacting business, or knowing what he was doing, and was in fact *non compos mentis;*

and that defendants, knowing his condition, fraudulently worried and bewildered him, by artful language and constant offers and proposals, until they finally induced him to make the trade. The bill prays for a rescission of the contract and a return of the property, or judgment for its value.

There is much conflict in the evidence in relation to the value of the property included in the trade, the valuation of plaintiff's property by the witnesses running from $650 to $1,400, and of the defendant's carriage from $250 to $800, but the weight of evidence warrants the conclusion that the property which defendants received from the plaintiff was worth, at a fair cash valuation, $750, exclusive of the mortgage for $150, and that on a like scale of cash valuation the carriage which plaintiff received from the defendants was not worth at most over $400. In other words, the plaintiff agreed to pay for the carriage more than twice its value in this or any other market, and this disparity in the value of the property given and received does not disclose the extent of the plaintiff's improvidence and folly in making the trade, for the only use plaintiff had for the carriage, and the use to which he expected to put it, so far as he had any comprehension on the subject, was that of a public hack or carriage to carry passengers in and about Hot Springs. Its age and construction rendered it unfit for such service on the rough and rocky roads of that region, and at that place and to the plaintiff it was worth but little more than the amount of the mortgage lien retained upon it by the defendants.

The evidence as to the mental condition of the plaintiff at the time he made this contract is voluminous and somewhat conflicting, but the weight of evidence establishes these facts: That the plaintiff, for some years preceding the making of this trade, had been first a stage driver, and afterwards a mail contractor and proprietor of horses and mail coaches, and that for some months immediately preceding the trade he had been at Hot Springs engaged in keeping hacks and other vehicles and teams for carrying persons and hauling freights for hire. In the conduct of this business he employed two or more teamsters, and was unusually diligent

and careful in the direction and management of his business, and the care of his property, attending at the stable where his stock was kept early and late, exacting from his hired men the strictest attention to their duties, constantly supervising them himself, and seemingly indisposed to trust the care and management of his stock to any one. He was a good judge of vehicles of all kinds and horses, and knew their value; was a shrewd and close trader in such property, and those who dealt with him had to pay full value for what they got. When his team ran away with him on the fourteenth of July, and upset his coach, he was thrown from the driver's seat, and his head and other parts of his body struck the ground with considerable force. He was conveyed to his boarding house, and Dr. Barry, a respectable physician, of more than 20 years' practice, called to see him. The doctor found him suffering from concussion of the brain, and a painful injury to the foot or ankle-joint. He was then, in the language of the doctor, "partially delirious, and his acts and speeches indicated a deranged condition of mind." The doctor saw him no more, but he testifies that the condition of mind in which he found him might have continued 10 or 15 days, and other witnesses testify that there was no change in his condition up to the time the trade was made. Those who were with him during this time testify that he begged them to kill him, threatened to commit suicide, seemed utterly indifferent as to what became of his property; that he was in this condition when he directed his hired man to take his property to Little Rock and dispose of it; that he was in this condition when he arrived at Little Rock, and during all the time he remained there; that he had to be assisted in and out of the hack, and could walk with difficulty by the aid of crutches; that he seemed to be suffering intense pain from his injuries, and had to be watched while in bed at night; that the night after he got to Little Rock, in the absence of his watchers, he got out of his bed, and went out in town at one or two o'clock in the morning to find a purchaser for his property; that against the earnest protest and advice of his hired man he made the trade in question that morning; that

he exaggerated the value of the carriage he got, saying it was worth $10,000, and that the speaking tube, extending from the inside of the carriage to the driver's seat, was worth $500. Other acts and speeches of plaintiff are detailed by the witnesses, going to show his reasoning faculties were more or less deranged. His condition remained the same for four or five days after the trade, when his mind seemed to be restored to its normal condition, and he inquired for his property, and seemed quite confounded when told he had traded it for the carriage. He testifies that he has no knowledge or recollection of anything that he said or did from the fourteenth of July, the date he received his injury, until the twenty-second day of that month.

Persons who saw the plaintiff casually during this time testify that they observed nothing in his speech or action to indicate that he was not sane; but those who were well acquainted with him, and who were with him much before and after the injury, and who had the best opportunity of forming a correct opinion on the subject, agree in saying he was not in his right mind, and was utterly incapable of transacting business, or forming or exercising a deliberate and intelligent judgment on any subject.

Opinions of witnesses not experts are competent evidence in cases where the object is to prove capacity or incapacity to make a contract when the facts or circumstances are disclosed on which they found their opinions. *Kelly's Heirs* v. *McGuire*, 15 Ark. 555, 601.

In answer to a hypothetical question, which fairly stated the plaintiff's condition as disclosed by the evidence, Dr. Barry gives it as his opinion that the facts indicate a deranged condition of mind at the time the trade was made.

One of the physical causes of insanity is severe injuries to the head from blows, causing concussion of the brain. The evidence satisfactorily establishes the fact that the fall plaintiff received produced concussion of the brain, and that this condition continued until after the trade with defendants.

Against the consequences of mistaken judgment or mere imprudence and folly on the part of one making a contract

courts can grant no relief. If the party was capable of entering into a contract, and there was no fraud, it is binding, though it may be obvious that he acted improvidently, and paid for property purchased greatly more, or received from property sold greatly less, than it was worth.

It is impossible to define with exactness the degree of unsoundness of mind that renders a party incapable of entering into a binding contract. Weakness of understanding, or that deficiency of intellect which errs in judgment and easily makes mistakes, is not enough of itself to avoid a contract. But the acts and contracts of persons who are of weak understanding, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justifies the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented, or overcome by cunning artifice or undue influence. 1 Story Eq. Jur. § 238.

In *Kelly's Heirs* v. *McGuire*, 15 Ark. 555, 603, the court say: "If a person, although not positively *non compos* or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition or resist importunity or undue influence, a contract made by him under such circumstances will be set aside;" and in *Beller* v. *Jones*, 22 Ark. 92, 99, the court said: "No evidence was introduced by Jones so effective, none could be introduced more convincing, to show mental derangement or want of natural sense as is the agreement itself charged by him and admitted by Beller to have been made."

It must be conceded that the contract from which the plaintiff seeks to be relieved cannot be said to be so grossly improvident as in itself to justify the conclusion of insanity on his part, or fraud on the part of the defendants; nevertheless, its improvidence and folly are an important circumstance, tending to strengthen the conclusion, supported by the evidence, that his mental capacity was not adequate to the making of a valid contract, for it shows that in the very matter under consideration he did not act like a sensible or sane man, but quite the contrary.

It is obvious from the evidence that the plaintiff, at the very time he made this trade, ought to have been in his bed receiving proper medical treatment for his injuries; and he probably would have been there if the purpose of visiting Little Rock to dispose of his property had not been the one thought fixed in his mind and in course of execution at the moment of the injury. In his delirious condition, after the injury, he fancied that purpose must be carried out; and his trip to Little Rock, while laboring under concussion of the brain, and suffering excruciating pain from the injury to his ankle, was itself an insane act, or at least an act that no man in the full possession of his senses would have attempted.

A party is not bound by a contract entered into where his mental condition is such as to preclude any fair or reasonable exercise of the reasoning faculties. While the plaintiff's injuries did not produce a total eclipse of his mental faculties, they did so weaken and derange them that he was not capable of comprehending the subject of the contract, and its nature and probable consequences, and he is not, therefore, bound by it. It is a fortunate circumstance that the carriage received by plaintiff from the defendants has been securely housed during this litigation, and that it remains in the same condition as when plaintiff received it, so that defendants can be placed *in statu quo*. The defendants having parted with the property received from the plaintiff must account for the fair cash value of the same at the time the trade was made, which is found to be $750, and 6 per cent. interest on the same to date of decree.

The cross-bill of defendants, seeking to foreclose the mortgage on the carriage, given to secure the $150 "boot money," must be dismissed, and the defendants required to surrender the notes and mortgages for cancellation, and to pay all costs.