MOORE et al. v. NORRISTOWN TRUST CO.

(District Court, E. D. Pennsylvania. May 29, 1917.)

No. 1331.

REMAINDERS ☞14—SALE OF INTEREST IN REMAINDER—VALIDITY.

Complainant's intestate was the owner of one-third interest in an estate in remainder after the death of the survivor of three life tenants. He sold and assigned the right to receive $400,000 out of such interest to defendant for $90,000. At that time the life expectancy of the youngest of the life tenants, computed by the American Life Tables, was 24 years. The assignor, while having ample intelligence to understand what he was doing, was intemperate and a prodigal spendthrift, weak in character, and subject to imposition by the unscrupulous; but such fact was not known to defendant, which dealt with him in good faith. He also had the assistance of counsel in the negotiations. After his death, complainant brought suit to set aside the sale; one of the life tenants being

still living. There was no offer to reimburse defendant, so as to place it in statu quo ante; but complainant asked that the transaction be decreed a sale or collateral loan, whichever might prove to be the more advantageous to decedent's estate. *Held*, that the consideration paid was not inadequate, and the sale was one which the assignor, if desiring to sell, might reasonably have made, if fully competent, and that, in view of such facts and the good faith of defendant, there was no ground which would justify a court of equity in remaking the contract as prayed for.

In Equity. Suit by Gertrude L. Moore, individually and as ancillary administratrix of the estate of Henry G. Moore, deceased, and Eliza C. Schott, against the Norristown Trust Company. Decree for defendant.

Jordan & Williams, of New York City, and C. P. Sterner and R. D. Brown, both of Philadelphia, Pa., for plaintiffs.

Alex. Simpson, Jr., of Philadelphia, Pa., for defendant.

DICKINSON, District Judge This is a bill to cancel a conveyance, following the sale of a property, on the ground that the vendor was without legal capacity to make a valid sale. The property sold was the right to receive $400,000 out of one-third of the remainder of the estate of Andrew M. Moore, deceased, upon the death of the survivor of his three sons, the income from which remainder was payable under a spendthrift trust to the sons and the survivors until the death of the last survivor. The transfer now asked to be avoided was made July 23, 1902. At the time the expiration of life (as figured from the American Life Tables) of such last survivor was such that it is agreed that an estimate of 24 years before the remainder interest would fall in and the principal become payable was a fair one. Two of the three sons are now deceased. Each of those now deceased lived out about his expectation of life as thus estimated. The life expectation of the survivor has still some years to run. The interest affected by the assignment before us is the interest of Henry G. Moore. He is now deceased, and the bill was originally filed by his administrator. As in his lifetime he had been adjudicated a bankrupt, his trustee in bankruptcy was by amendment added as a party plaintiff. The bill as filed avers, to quote from the paper book of counsel for plaintiff:

"That at the time of said conveyance [the grantor] was mentally and physically incapacitated from executing the same, or from knowing the true extent and meaning thereof, was insane and a confirmed victim of drugs and medicines(?), was of immoral habits and a perfect tool in the hands of those whom the defendant employed to secure the signature of the said Henry G. Moore to the same."

The present counsel for plaintiff have incorporated in this statement a quotation from the bill without, we assume, adopting as their own the language in which the thought intended to be expressed is given expression. The quoted phrases are clearly intended to convey to our minds two thoughts: One is that the sale referred to was void, because made by one who was without legal capacity to contract; and the other, that the grantee had fraudulently procured the sale to be made to it. It may be stated preliminarily to any discussion of the

true fact situation that, if either of these averments were supported by anything which is in evidence in this case, the burden resting upon the trier of the facts would be, under the facts which are in evidence, rendered a very light one. Indeed, if there was anything in the case to justify a finding, or even to give to such finding color of probability of its correctness, that the sale now questioned had been brought about by the active procurement of the defendant, or the grantor had been sought out by the defendant and urged to make it, little time would be required to reach a decision indicating the decree which should be entered.

We premise the discussion of the facts, in order to shorten it, with the statement that, whatever the truth may be, there is absolutely nothing in the evidence which hints at aught else than the fact that the defendant acted without knowledge, reason to believe, or thought of anything else than that the vendor was fully competent to act, that he was acting with due deliberation and upon careful consideration, that he had the aid of competent and faithful counsel, who were advising him in what he did, and that the consideration paid was a concededly adequate and fair one for what was sold and bought. Indeed, the sole question of difference of opinion which arose between the parties or counsel was over, not the fair value of that which was sold, but over the fair value of the remainder, a third interest in which (after the life estates had fallen in) was at first proposed to be sold. All such difference of opinion was removed by the suggestion to sell, not this one-third interest in the remainder of the estate, but the right to receive $400,000 out of this one-third interest at the death of the survivor among the life tenants. We are, of course, bound to find the fact of undue or improper conduct on the part of the vendee in accordance with the evidence, whatever the truth might be surmised to be, or whatever suspicions might be aroused; but the presumption that the truth is in accord with the evidence is confirmed and strengthened by the circumstance that not even the heat of an earnest argument has induced or tempted counsel for plaintiff to hint, much less assert, that the defendant had acted otherwise than in good faith or with knowledge that the grantor was an incapable.

The whole difficulty, and the only difficulty, in reaching a satisfying judgment of the merits of this case, arises out of the existence of these two facts: One is that the grantor was a prodigal spendthrift, without other limitation to his impulse to throw away what he had than the extent of his possessions. The other is that the defendant dealt with him without knowing that he was what he was, and gave him a price for that which was sold which is not even now criticized as inadequate, much less unfair. The one fact calls loudly upon the law to protect, not the man himself, who, because he was what he was, could neither be protected nor even benefited, but to save his estate, if possible, to his family from a waste so inane as to be painful to witness. The other voices just as loudly the necessity for caution, lest injustice be done to the purchaser and injury to the public, by setting up unwise and impracticable standards and tests in business transactions.

It is as well to dispose of this latter feature of the case, for it goes to the whole bill in respect to its legal merits. In disposing of this feature we will assume (to paraphrase a citation in the paper book of plaintiff) that the—

"sale will be set aside if the vendor, while not non compos mentis or insane, was none the less so far an incapable that a contract made by him should be scrutinized with the utmost care, to determine whether in itself it was of such a character as that a person fully competent to contract would have entered into that kind of a contract, although willing to sell."

This comes close to determining whether the transaction furnishes internal evidence of such imposition or overreaching as to lead to the conclusion that no one except an incapable would have made it. In the first place, we are bound to find that the vendor protected himself absolutely against any possible undervaluation of the thing which he was selling by limiting the value of what he sold to a $400,000 interest. The sale was not of property of uncertain value, but of a fixed sum of money. It might be of less value than $400,000, but it could not be more. The then present value of the $400,000 was uncertain, because it was to come into possession at the end of three lives then in being. The time of the receipt of the money could not be known, but it could be and was determined by reference to the American Life Tables, giving the expectation of life of the youngest of the three life tenants. This, as a basis of valuation, might well be accepted by the most capable and the shrewdest of vendors. This basis, in fact, favored the vendor, because the contract was based, not upon the death of the youngest of the sons, but upon that of the survivor of the three. In golfing parlance, handicapping the players by figures representing the expectation of the life of each in reverse order, the vendee was playing a match, not with the life tenant having the lowest handicap, but playing the best ball of the three. A mere contrast of the figures, $90,000 paid and $400,000 to be received, would startle us into the conviction of inadequacy of price. When tested, however, by any known test, the application of which has been suggested, this first-blush conviction of inadequacy is changed.

Given the choice of $90,000 now, or of $400,000 to be received at the death of the survivor of three persons, the youngest of whom has a life expectancy of 24 or 25 years, any one might well hesitate which to take. Let us apply a very simple test, and assume the $90,000 to have an earning capacity of 6 per cent. Assume, further, that the interest or income was invested in that form of savings fund investment known as a building association, and as the stock matured the income with its additions reinvested. At the end of the life expectancy period, the stock would have twice matured and a third period would have been entered upon. At the first maturing period the stockholder would have had $180,000, and at the second $360,000. This, with the value of his holdings in his third investment, would have exceeded $400,000. The annuity tables reversed, and reduced to a 6 per cent. basis, and the interest tests would show a like denial of any substantial inadequacy. Reduce the figures to the form of a corporation bond or stock issue, and assume a bond or stock issue of 4,000 bonds, or

shares, of the par value of $100. Assume no interest or dividends to be either paid or earned during the lives of any of three persons of the expectancy of life, respectively, of these life tenants. Would $22.50 be deemed an unduly low price? Add to these tests the fact that the case is barren of any evidence or suggestion even that the price was in fact inadequate, and we reach pretty nearly an impossibility to discover any legal justification for a finding that any undue bargain was driven by the defendant.

The line to be drawn in cases of this general character is located for us as definitely as it can be in the citations quoted in Kilgore v. Cross (C. C.) 1 Fed. 578. From this we gather the thought that when there is capacity to act, so that we are beyond the line of legal incapacity, rendering the contract void, there must be in the case an element very much like actual fraud in order to avoid the contract as made, and there is no better nor more convincing evidence of the presence of this annulling element than the transaction itself, the binding character of which is in dispute. This internal evidence, as it may be called, must show more than mere inadequacy of price, although this, if gross, may with some evidence of incapacity, even if the latter be slight, suffice to support a decree annulling the transaction. Fraud is a term which does not lend itself to definition, nor can a measure be assigned to the mentality or intelligence required to give binding effect to a contract. The presence of legal capacity is something felt, and cannot otherwise be sensed.

One obstacle to a decree in plaintiff's favor in the present case is, not the fact that this grantor had sufficient intelligence to grasp and to discuss all the considerations which entered into the making of the contract of sale, but the absence of the employment of any artifice or undue influence, or even the acceptance of any undue benefit from the bargain by the grantee. This latter feature is the real touchstone of all these quasi incapacity to contract cases. The question is never so much what the grantor had the capacity to do, as whether the grantee received that which a right-minded person would not under all the circumstances have consented to accept, not from any grantor, but from that grantor. It is this second element which impels a court to undo what has been done by cutting the contractual ligaments by which the grantee has sought to bind the grantor. The element of incapacity is brought in to supply an excuse, if not a legal justification, for doing justice, and to bring the ruling in line with accepted legal principles. It is somewhat analogous to the expedient of bringing in the fiction of lost services to award damages to a father whose daughter has been debauched.

Another obstacle to a decree in favor of the plaintiff is interposed in that, the absence of bad faith on the part of the grantee being conceded, no means of restoring the status quo is suggested. The decree we are asked to make is nothing more or less than the rewriting of the contract to make it a collateral loan (instead of a sale) with an "if" condition. The "if" is to be resolved by the event. If the bargain as made turns out to be favorable to the grantee, the sale as made becomes a loan. If, on the other hand, the bargain results in advantage

to the grantor, the sale as made remains a sale. This view of the law of the case is in accord with all the adjudged cases to which we have been referred, some of which, listed from the citations in the paper books, are as follows: Kilgore v. Cooper (C. C.) 1 Fed. 578; Billings v. Aspen, etc., 51 Fed. 338, 2 C. C. A. 252; St. Louis, etc., v. Phillips, 66 Fed. 35, 13 C. C. A. 315; Moore v. Gilbert, 175 Fed. 1, 99 C. C. A. 141; Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260; Griffith v. Godey, 113 U. S. 95, 5 Sup. Ct. 383, 28 L. Ed. 934; Conley v. Nailor, 118 U. S. 127, 6 Sup. Ct. 1001, 30 L. Ed. 112; Thackrah v. Haas, 119 U. S. 499, 7 Sup. Ct. 311, 30 L. Ed. 486; Towson v. Moore, 173 U. S. 17, 19 Sup. Ct. 332, 43 L. Ed. 597; Nace v. Boyer, 30 Pa. 99; Bank v. Fidelity, 251 Pa. 529, 97 Atl. 75.

The foregoing desultory and rambling discussion indicates with sufficient clearness the conclusion with which the trial of the case has impressed us as the proper one. These impressions may be thus summarized. The kind of man the grantor was, and the utterly inane way in which he frittered away the fortune left him by his father, and the consequent destitution to which he subjected his wife and daughter, would make any one eager to seize upon anything which would serve as an excuse for undoing anything which he had done. As in life, so in death, it is absolutely impossible to do anything to protect a man of this type or his property from himself. The world-old task of making a silk purse out of a sow's ear is easy in comparison. The parties are, however, entitled to have findings of facts as definitely formulated as the nature of the case will permit. They cannot be definitely made without restating the testimony at length. For this reason, and because the argument was had at the close of the trial without the opportunity for counsel to prepare paper books, we will answer for incorporation with this opinion any requests for findings of fact or conclusions of law which counsel care to submit.

It is an easy feat to call up in our minds a picture of this grantor as he was. He is, however, dead, and nothing but a sense of duty would reconcile us to the wisdom or necessity of "drawing his frailties from their dread abode." To produce this portrait for inspection is not an agreeable or an easy task. To adequately portray his "progress" would require the genius and the pencil of a Hogarth. The common speech of the people supplies us with a phrase which fits him as with a garment. He was a "good for nothing." As a label of his character the phrase is just. To be understood as descriptive, emphatic emphasis must be placed upon the final word. The probabilities are he was a congenital fool. The further probability, reaching a normal certainty, is that he was never subjected in his childhood and early youth to that training and discipline which to one of his weak character was absolutely necessary to make him even passably decent. As soon as he was old enough to learn of them, he indulged himself in all the vices and follies within his reach. He ran the gamut of them all—sexual immoralities, drunkenness, and vile drugs, which give their deluded victims for a brief moment a horrid counterfeit of the joys of life. The consequence was, of course, his absolute ruin. He became a moral, mental, and physical wreck, and at last presented that most disgusting,

if not pitiable, of all spectacles, a worn-out roué, cursed by desires which he could no longer gratify, and with nothing left to him except his egoism. He was throughout his whole career a most inane, profligate, and prodigal spendthrift. He threw away all he had to any one who was unscrupulous enough to pick it up. He was the easy victim of the grossest and clumsiest of frauds.

This was not because he had not the intellect to grasp and understand what he was doing, but because he was so egotistically indulgent of himself and so weak in character that he did not value what he had in hand, however great its value might be, in comparison with the gratification of the slightest whim of desire, no matter how trivial the object of his desire might be. This made of him an easy mark. There was no limit to the extent of the fraud which could be imposed upon him, other than the moderation of the one who fleeced him. This is disclosed by many of his transactions. He was, indeed, able in some of his financing to get in the position of having accomplished the impossible feat of borrowing large sums of money, running into thousands, from people who in the first place had not a dollar to loan him, and in the second place would not have advanced him a nickel. The evidence clearly shows that to have saved him from robbery in one transaction would merely have preserved what he had to become the loot of the next despoiler whom he encountered. If it were possible to have turned back into his estate any share of his interest in his father's estate, there would be grave danger it would go to those who have no just title to any of it.

The effects, physical, mental, and moral, of his indulgence in drink and vile drugs, are well described by Dr. Attex as those which always befall the victims of such vicious habits. When under their influence he was the subject of delusions and hallucinations. The after effects sent him into the horrors of a depression of spirits from which he could think of no relief except a resort to reindulgence in what had produced that condition. The delusion of being pursued remained with him for longer and longer periods. There never was a time, however, at least before the time of the contract of sale now under investigation, when, except while under the direct influence of intoxicants or drugs, he had not the intellectual capacity required for the transaction of any business act.

There is absolutely no evidence that the defendant knew or had reason to suspect that it was dealing with a man whose capacity was even open to question. The fact is, however, that he was of that type of hopeless irresponsibles that no one, no matter how high their character or unsullied their reputation, could have a voluntary dealing with him, without paying the penalty of being deemed by all who knew the grantor of being unscrupulous simply because of having had a business dealing with him. It would have been taken for granted, by those who knew Moore, that no one, unless their duty absolutely required it, would have any dealings with him, unless their purpose was to rob him. Even those who were parties to this transaction, unimpeachable as they have always been in character and reputation, are saved from this impeachment solely by the fact that they

did not treat him unfairly. In this is presented the whole merit of the defense and the weakness of the case against this defendant. The following findings and conclusions justify a dismissal of the bill:

1. The grantor had amply sufficient intelligence to understand all he was doing and to comprehend the effect of any bargain he was about to make.

2. He was, however, so weak in character, and so blinded by the strength of his impulse to gratify his desires, and so dominated by the egoism which made nothing of value in comparison with the gratification of his merest whim, that he invited himself to be defrauded by every person of evil design with whom he came in contact.

3. The defendant dealt with him without knowledge or suspicion that he was an incapable, and without anything appearing in the course of the transaction which gave notice or warning of his true character and business capacity.

4. There is nothing in the contract of sale from which it would appear that the grantor had been overreached, and no averment based upon the evidence before the court that any advantage in purpose or result had been taken of him.

5. The grantor was so far an incapable, and so far incompetent in fact to enter into any contract, that one made by him which was greatly and unduly to his disadvantage might be presumed to be the product of a fraud practiced upon him.

The bill is dismissed, with costs to defendant, and a formal decree to this effect may be submitted.

Questions as to the competency of some of the witnesses and as to the admissibility of some of the evidence were raised at the trial. In accordance with the wish of counsel, the decision of all such questions, except in one or two instances, was reserved. We have not thought it necessary to discuss the competency of any of the witnesses who testified under objection, or any of the evidence which was admitted under a like objection, because the findings of facts made have been reached independently of and without regard to all such testimony and evidence. The question of the competency of the witnesses who did not testify, or of the admissibility of the evidence which was rejected, was not discussed at the argument. We do not mean that the questions were waived, because there were other reasons for not discussing them. The undue length to which this opinion has already been drawn out is a reason, however, for us to leave all such rulings to vindicate themselves, or to the support of the counsel in whose favor the rulings were made, respectively.