HESTER ANN TURNER, WILLIAM H. H. TURNER and
ROBERT TURNER, Trustee, and others *vs.* THOMAS J.
RUSK, JR., and others.

*Proceeding in Equity to Annul a Deed made by a Person when
Insane—Proof of Continued Insanity.*

A person of full age who has been insane, may, after he has suffi-
ciently recovered his reason to understand the character of his act,
file a bill in equity to annul a deed or contract to his prejudice
made by him, when he was of unsound mind and incapable of
contracting.

The maxim of the law, " once insane presumed to be always insane,"
is not an unqualified one. Neither observation nor experience
shows us that persons who are insane from the effects of some
violent disease, do not usually recover the right use of their mental
faculties. Such cases are not unusual, and the return of a sound
mind may be anticipated from the subsiding or removal of the dis-
ease which has prostrated their minds. If, therefore, the proof in a
proceeding to annul a deed made by a person to his prejudice when
he is alleged to have been insane, only shows a case of insanity
directly connected with some violent disease, the party alleging
the insanity must bring his proof of continued insanity to that
point of time which bears directly upon the contract impeached,
and not content himself with proof of insanity at an earlier period.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER,
ALVEY and IRVING, J.

*William A. Stewart* and *R. J. Bouldin,* for the appel-
lants.

The appellants contend, that the complainants to sus-
tain their case, must prove that confidential or fiduciary

relations existed between William L. Rusk and the defendants at the time of the execution of the deed of December 27th, 1862, or that William L. Rusk was mentally incapacitated on that day from executing said deed. *Todd vs. Grove,* 33 *Md.,* 188.

The rule of evidence, that where insanity is proved or admitted at any particular time it is presumed to continue, does not apply to insanity caused by violent disease. *Hix vs. Whittemore,* 4 *Metc., (Mass.,)* 545, 546 *and* 547; *Ray Insanity, (5th Ed.,)* 421 *and* 422; 1 *Beck Med. Jur.,* 586; *Browne Insanity, sec.* 518 *and note* 4; 3 *McLain,* 55; 18 *Ill.,* 282; 8 *Ind.,* 411; 7 *Wait's Actions and Defences,* 151; 2 *Abbot, (U. S.,)* 507; 58 *Me.,* 453; *Carthwright vs. Carthwright,* 1 *Phillimore,* 100; *Ewell's Medical Jurisprudence.*

Absolute soundness of mind is not necessary to enable a person to make a valid contract or conveyance; the true test is, whether the party had the ability to comprehend, in a reasonable manner, the nature of the particular transaction in which he participated. This is the rule in the absence of fraud. 3 *Phillips on Ev.,* 604, 606; *Lozier vs. Shields,* 23 *New Jersey Eq.,* (8 *C. E. Green,)* 509, 511; *Dennett vs. Dennett,* 44 *N. H.,* (7 *Chard. Cr.,)* 531, 538 *and* 539; *Shelf. on Lunacy,* 37; *Re Morgan,* 7 *Paige,* 237; *Speers vs. Sewell,* 4 *Bush., (Ky.,)* 239 *and* 241; *Honey vs. Hobson,* 55 *Maine,* 256, 259, 280 *and* 283; *Miller vs. Craig,* 36 *Ill.,* 109 *and* 110; *Aiman vs. Stout,* 42 *Penn. State,* 115, 123 *and* 124; *Browne on Insanity, sec.* 25; *Rippy vs. Ginot,* 4 *Ired. Eq.,* 413.

*Thomas A. Whelan,* for the appellees.

The grantor had full power to institute proceedings to have a deed made by him, while of unsound mind, set aside; he having sufficiently recovered to know the character of his act. 1 *Collinson on Lunacy,* 404; *Ray on Insanity,* 10; 1 *Story's Equity Juris., secs.* 225–230; 1

*Chitty on Con.*, 187; *Yates vs. Boen*, 2 *Str.*, 1104; *Webster vs. Woodford*, 3 *Day*, 90–100; *Rice vs. Peet*, 15 *Johns.*, 503; *Mitchell vs. Kingham*, 5 *Pick.*, 431; *Seaver vs. Phelps*, 11 *Pick.*, 304; *McCreight vs. Aiken*, 1 *Rice*, 56; *Lang vs. Whidden*, 2 *N. H.*, 438; *Grant vs. Thompson*, 4 *Conn.*, 208; *Fitzgerald vs. Reed*, 9 *Sm. & M.*, 102; *Arnold vs. Richmond Iron Works*, 1 *Gray*, 438; *Wait vs. Maxwell*, 5 *Pick.*, 220; *Allis vs. Billings*, 6 *Met.*, 418, 419; *Gibson vs. Soper*, 6 *Gray*, 280; *Owings' Case*, 1 *Bland*, 376, 381, 384; *Chew vs. Bank of Baltimore*, 14 *Md.*, 318; *Wampler vs. Woolfinger, et al.*, 13 *Md.*, 337.

If the deed in question was executed in a lucid interval, the defendants must prove the lucid interval by proof as strong as that required to prove the insanity. *Brooke vs. Townshend*, 7 *Gill*, 32; *Higgins vs. Carlton*, 28 *Md.*, 142; 1 *Collinson on Lunacy*, 39, 53, 54; *Ray on Insanity*, 335, 336, 340, 341, 345.

Whenever parties stand in a confidential relation towards each other, and any advantage is taken of that confidence, relief in equity will be administered with as much promptness as upon any other ground. *Wilson vs. Watts*, 9 *Md.*, 386; *Billing vs. Southee*, 10 *Eng. Law & Eq.*, 39, 40; 1 *Story's Eq.*, secs. 221, 222.

Weakness of intellect taken along with a confidential relation, are all circumstances calculated to impeach a deed as constructively fraudulent. 1 *Story's Eq.*, sec. 237; *Brooke vs. Berry*, 2 *Gill*, 83, 102; *Chew vs. Bank of Balto.*, 14 *Md.*, 318; *Davis vs. Banks*, 3 *Md. Ch.*, 139; *Long vs. Long*, 9 *Md.*, 348; *Central Bank vs. Copeland*, 18 *Md.*, 317; *Todd vs. Grove*, 33 *Md.*, 197; *Blackford vs. Christian*, 1 *Knapp*, 78; *Wilson vs. Watts*, 9 *Md.*, 440.

It is not necessary to show actual fraud, where confidence is reposed. If the situation is such that the parties must have had the influence over him, the Courts will relieve. *Wilson vs. Watts*, 9 *Md.*, 428; *Davis vs. Cooper*, 5 *Myl. & Cr.*, 277; *Purcell vs. McNamara*, 14 *Ves.*, 91,

Turner, *et al. vs.* Rusk, *et al.*

107, 115; *Huguenen vs. Basely*, 14 *Ves.*, 284; 1 *Story's Eq.*, sec. 329 *a*; *Allore vs. Jewell*, 4 *Otto*, 506.

Whenever a fiduciary relation exists, legal or actual, whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of equity, independent of the ingredients of positive fraud, through public policy, as a protection against overweening confidence will interpose to prevent a man from stripping himself of his property. 1 *Story's Eq.*, secs. 303 to 322; *Highberger vs. Stiffler*, 21 *Md.*, 352; *Hatch vs. Hatch*, 9 *Ves.*, 221; *Todd vs. Grove*, 33 *Md.*, 197; *Rhodes vs. Bate*, 1 *Chan. App.*, 256; *Griffiths vs. Robins*, 3 *Mad.*, 191; *Welles vs. Middleton*, 1 *Cox Ch. Cases*, 112; *Gibson vs. Russell*, 2 *Y. & C.*, 104; *Rhodes vs. Bate*, 1 *Chan. App. Cases*, 252.

The principles stated are independent, both of actual fraud in the donee, and of any weakness of mind in donor, although the presence of either one of those ingredients would of course make the case so much the worse; and if actual fraud is charged in the bill and not proved, yet the averment is sufficient for obtaining relief. *Bridgsman vs. Green, Wilmot*, 70; *Brice vs. Brice*, 5 *Barb.*, 533; *Whelan vs. Whelan*, 3 *Cowen*, 537; *McCormick vs. Malin*, 5 *Blacf.*, 523, 525, 531; 1 *Story's Eq.*, secs. 309, 323; *Highberger vs. Stiffler*, 21 *Md.*, 352; *Harding vs. Handy*, 11 *Wheat.*, 125; *Allore vs. Jewell*, 4 *Otto*, 511; *Owings' Case*, 1 *Bland*, 397.

MILLER, J., delivered the opinion of the Court.

A person of full age, who has been insane, may, after he has sufficiently recovered his reason to understand the character of his act, file a bill in equity to annul a deed or contract to his prejudice, made by him when he was of unsound mind, and incapable of contracting. This proposition was conceded in argument, and the contrary doctrine has long since been repudiated by every American

Court, and denounced as having no foundation in reason or justice, and as dishonoring the jurisprudence of a civilized people. The bill in this case is one of that character. The deed sought to be vacated was executed by the complainant, William L. Rusk, on the 27th of December, 1862. It is a lengthy document and was carefully and skilfully prepared by an attorney of ability and experience. By it the grantor, "for divers good causes and valuable consideration, and also in consideration of the sum of ten dollars lawful money," conveys certain real estate situated on York avenue in the City of Baltimore, worth, as the proof shows, more than $10,000, to Robert Turner and his heirs, *in trust* for Barbara Rusk, the mother of the grantor, during her life, and after her death *in trust* for his sister Hester Ann Turner, wife of William H. H. Turner, with power to the said Hester to dispose of the property absolutely by deed or will, and if she died without making such disposition, then *in trust* for her children, but if she died without leaving children or descendants of children living at the time of her death, or should such children or descendants all die under age and without issue, then *in trust* for such persons as would by the then existing laws of Maryland, be the heirs of the said Hester to take an estate in fee in land by descent from her. These are its most important and main provisions.

When this deed was executed the complainant was about forty-eight years of age, and had never married. His mother was then, according to the testimony of Mrs. Turner, about seventy-five years of age, and she died in the early part of the year 1875. Mrs. Turner was his only sister, and he was very much attached to her, but he also had four brothers towards whom there is nothing to show he entertained other than kindly and fraternal feelings. At that time he was also possessed of other property, which however was subsequently sold, and it seems the proceeds of it were not more than sufficient to pay the debts he

owed at the date of the deed. He therefore in fact by this voluntary deed, conveyed away absolutely, and without any pecuniary consideration, all the property he had save what was sufficient to pay his creditors.

He filed his bill to vacate that deed, on the 23rd of February, 1877, and in it he avers, in substance, that at the time of the execution thereof, and for some time previous, and for several years thereafter he was mentally incapacitated from making a valid deed or contract; that he remembers being told at the time that it was done to save his property for him, and that is all he knew or recollects being told in relation to it; and he charges that he was fraudulently deceived and imposed upon by the trustee named in the deed, or by some of the *cestuis que trust* therein as to the character of the transaction. The parties defendants are the trustee and the *cestuis que trust* under the deed. There has been no alienation of the property by Mrs. Turner, under the power contained in the instrument. These defendants in their answers, deny all the allegations of the bill, and especially the fraud and deception imputed to them, and aver that the complainant at the time, and for a long time before was capable and mentally qualified, and in nowise incapacitated from making a valid deed or contract, and that he well knew when he signed it, the import and meaning of this instrument and the reasons why he made and executed it. In the progress of the case, and after a large part of the testimony, including his own, had been taken, the complainant died, and the appellees, his heirs-at-law, other than Mrs. Turner, were admitted as complainants to prosecute the suit in his stead.

The issue thus made by the bill and answers, is purely one of fact to be determined by the evidence in the cause. That evidence, consisting mainly and almost exclusively of the oral testimony of a large number of witnesses, is very voluminous, covering more than two hundred

and fifty pages of the printed record. The task of examining and analyzing it, aided as we have been by the briefs, and oral arguments of counsel, has not been a slight one, but we have performed it patiently, carefully and to the best of our ability. Having done this our duty might well be discharged, as would that of a jury, by the simple announcement of our judgment that the deed ought to be set aside: for as each case of this character depends on its own facts and circumstances, and as these are in general, widely different in different cases, no great importance, as a precedent, can be attached to the opinion of an appellate Court in any such case. As the case however has been well and thoroughly argued on both sides, and as something more may justly be expected than the mere statement of the conclusion we have reached, we shall, as briefly as may be, state some of the general features of the case as they appear to us, and some of the principal reasons on which our judgment is founded. Before doing so it is proper to say that in forming that judgment we have considered none of the testimony that by possibility is obnoxious to the exceptions taken to it on either side, but only that which is undeniably competent and admissible. We have placed very little reliance upon the mere opinions of witnesses, (save those of the attending physicians) as to the mental capacity of this party, even where they have stated facts clearly sufficient to warrant the admission of such opinions as evidence. It is upon the facts themselves which the testimony discloses, and the description which the witnesses give, of his conduct, manner, and appearance that we have mainly relied.

The proof shows that Mr. Rusk, from early life, had been brought up to and engaged in beef butchering, a business, the successful prosecution of which requires energy, industry and a good degree of intelligence. In 1846 he purchased the property described in this deed for $7275, and from that time occupied the dwelling house

upon it and lived there with his mother. His packing house was also upon the same premises. He was successful, and carried on the largest business in his line that was then conducted in the City of Baltimore. He managed and supervised this extensive business in all its details himself, and suffered no one to interfere with him. He was remarkable for energy and industry, and stood in his stalls in the markets on every market day, during market hours, was close and cautious in his bargains, fond of money, and making and keeping it, though not miserly in disposition; enjoyed good health, had a strong will, sound judgment and was not disposed to talk much, was temperate in his habits, and mild and gentlemanly in manner and deportment. Such he had been from manhood, and was up to the memorable 19th day of April, 1861. On that, and the immediately following days, he was thrown into a condition of intense excitement, and on the 22nd went, or was taken, to the house of his sister, Mrs. Turner, where he remained until the latter part of 1863, or the beginning of 1864. When he first went there, his condition was such that he was for some time confined to his room, and did not go out of the house until the latter part of May. During the period between the 22nd of April and the last of May, he was undoubtedly insane. This is proved by those who sat up with him at night, as well as by the physicians who then visited and attended him, and we find no contradictory proof on this point. He was evidently laboring under the delusion that he had cut the telegraph wires and burnt the bridges, and was in fear and terror lest he should be pursued and arrested. Dr. Buckler, who saw him once during this period, in consultation with Dr. Maris, says he "found him insane, caused, it was believed, by the military preparations, by the affair on Pratt street, and by the general excitement of those times, and advised that he be removed to some quiet place, as far as possible from the distracting scenes,

surroundings and associations which had acted as the exciting cause of his derangement." Dr. Maris who was called in and attended him from the first, and who was also Mrs. Turner's family physician, says he "found him very sick, he was suffering from intense excitement of the brain. The condition in which I found him was one of intense general excitement, the primary disease being disease of the brain; it was cerebral and involved the whole brain; it might be called partial congestion of the brain, and, if unchecked, would culminate in apoplexy; it was a general case of brain trouble." He further says he resorted to extreme bleeding, which, probably, saved his life, and that the cause of the disease " was the general excited condition of the times, and particularly financial excitement connected with it."

The condition of insanity at this period, prior to the deed, being thus clearly established, it is a question more interesting than important, whether the insanity was of such a character as to bring into operation the maxim of the law, " once insane, presumed to be always insane," so as to throw upon those claiming under the deed the *onus* of proving it was executed during a lucid interval. This maxim is not an unqualified one. Neither observation nor experience shows us that persons who are insane from the effects of some violent disease do not usually recover the right use of their mental faculties. Such cases are not unusual, and the return of a sound mind may be anticipated from the subsiding or removal of the disease which has prostrated their minds. If, therefore, the proof only shows a case of insanity directly connected with some violent disease, the party alleging the insanity must bring his proof of *continued insanity* to that point of time which bears directly upon the contract impeach e d, and not content himself with proof of insanity at an earlier period. *Hix vs. Whittemore,* 4 *Metcalf,* 545. But this was not a case of *delirium* caused by a violent fever, nor *mania-a-potu,* nor

the result of any violent disease which ordinarily involves
a temporary loss of sanity, but a direct attack upon the
brain itself, of such intensity as usually results in pro-
tracted, if not permanent, injury to the mental faculties.
The most that can be said is that it was a case in which
eventual recovery of mental capacity was possible, and,
perhaps, probable, but necessarily gradual and slow.
Assuming, then, that this was not, at first, a case of what
the authorities term "*habitual* insanity," but one in which
the *onus* is upon the parties assailing the deed to 'prove
*continuance* of mental incapacity down to the time it was
executed. We think that *onus* has been met by the proof.
To this point the great volume of testimony on either
side has been directed. It is, of course, impracticable to
set it forth at length, and indulge in extended comments
thereon. All that can be expected is a general statement
of what we regard as established by the preponderance of
testimony.

Dr. Maris testifies on this subject, that from the time
of his first attack, and after he had recovered his physical
health, and for *several years after* the date of this deed, he
continued to see him frequently and occasionally as a
patient, and did not lose sight of him for more than two
or three months at a time, and that *during all this period*
he was suffering from imbecility of mind; the disease had
left its impression, had impaired his mind, had impaired the
integrity of his brain; that his expression indicated un-
questionably that he was not a man of sound mind; he
could say yes and no, and that was about all, was very
timid, afraid of his own shadow; and then this witness
expresses the opinion, that during all this time Mr. Rusk
was not capable of understanding, attending to or trans-
acting business, or of executing a valid deed or contract.
A large number of other witnesses who also saw him fre-
quently, and upon different occasions during the same
period, while he remained at the house of Mrs. Turner,

and after he left there in 1863 or 1864, and went back to his own house, where his mother lived, give strong testimony to the same effect. They describe the general expression of his countenance as simple and childish, that he appeared to be timid and frightened, with a wild and scared look from his eyes, and had grown fat and pussy, that he could hold no rational or coherent conversation with them, that when spoken to he would turn away and leave them, or put his hand on his head and say, or indicate, that there was something wrong there, in short, that his whole demeanor, conduct and appearance, were *entirely changed* and *radically different* from what they had been, and, in fact, were irrational and unnatural, and they give numerous instances and illustrations of such conduct. The witnesses who thus testify were his neighbors, intimate and social friends, who had known him from boyhood, those with whom formerly, and up to the 19th of April, he had had extensive and important dealings and business transactions, his former employés, and his two brothers, who, at the time they were examined, which was before his death, had no direct pecuniary interest in the result of the suit. During this period he gave no attention to, and had no supervision over his business, which was all the while conducted by others, in his name and at his risk, and there is nothing to show he manifested the least interest therein. He never returned to or visited his stalls in the markets, and never attended to the purchase of cattle, as he had invariably done before. His brothers carried on the business at the slaughter and packing houses and in the markets, while his mother and his nephew, the son of his sister, managed the financial part, and the proof shows it was not successful, or, at least, that it was not as extensive and as successful under their management as it had been under his own.

Let us now see what acts of a business character he did, or were done in his name after the 19th of April, and

before the deed, and subsequently to its date. He kept accounts in the Mechanics' and Marine banks, which are in evidence. The account in the first shows no deposits made after the 19th of April, and that he then had a balance, after deducting checks evidently drawn before that date, of $1636.85. The account then shows a check for this sum as of the 4th of December, 1861, but there is no proof whatever by whom or under what circumstances this check was drawn, or to what purpose the money was applied. The record is entirely silent upon the subject. In the Marine bank, the account shows two deposits of cash, one of $390 on the 25th of April, and the other of $300 on the 2nd May, 1861, but at that time he was undoubtedly confined to his room, and insane. The deposits must therefore have been made by some one else for his benefit. Two other deposits, one of $984 on the 26th of April, and the other of $120 on the 10th of May, 1861, the account shows were made by Mr. Clabaugh, (who is one of the witnesses above referred to,) and Mr. Musgrave, respectively. This left a balance due him of $1844.47, upon which no check was drawn until the 4th of April, 1863, and from that time until the 7th of November, following, the whole balance was drawn out by five checks, some of which were for small amounts. As to these checks also there is the same absolute silence and absence of proof. The complainant was examined as a witness on the 16th of May, 1877, and on cross-examination was shown a promissory note purporting to be signed by him, for $1000 at sixty days, payable to blank order, dated the 1st of November, 1862, and endorsed by Saml. Wilhelm & Co. and by Saml. Wilhelm, and he was asked whether the signature to it was his, and he replied "certainly that's my signature, I know that note." This is all that the record shows in regard to this transaction. The complainant does not say and was not asked when he derived knowledge of this note, or for what it was given, nor do the

other side explain this, or show how the note came to the hands of the cross-examining counsel or any of his clients. It thus appears that the signing of this note, as to the purpose of which the proof is silent, and the check of the 4th of December, 1861, as to which there is no explanation whatever, are the only business acts that can possibly be imputed to him, after the 19th of April, and prior to the date of this deed. In our opinion they are wholly insufficient either by themselves or in connection with the few unexplained checks commencing in April, 1863, to establish sanity, or overcome the proof of continuing mental incapacity offered on the part of the complainant. Indeed, the very fact that so few acts of this description could be discovered through a period of more than three years, while he had such large business interests at stake, tends to strengthen rather than weaken the inference of continued incapacity, which the positive proof indicates.

On the 14th of September, 1864, he appears to have executed two deeds, (conveying several lots on Fayette street,) one for the consideration of $1925, and the other for $1675. The next transaction was the sale of his market stalls which took place in 1865. This was a more important affair, and we have more light from the testimony in regard to it. The stalls were purchased by Mr. Hand, who was called as a witness for the defendants. His testimony is to the effect, that hearing the stalls were for sale, he went over to Mr. Rusk's house to see him, and was there told by Mr. John Turner his nephew, (who had been living with his uncle since the latter's return to his own house,) that he could not see Mr. Rusk then, and he would have to call again in two or three days; on his second visit, he found his mother and Mr. John Turner in the room with Mr. Rusk, and he says he offered *them* $7000 for the stalls, which *they* would not take but wanted $8000, and he left; on his third visit he found the same

three persons present, and he offered *them* $7500, and *they* would not take less than $7750, and Mr. Rusk wanted $8000, but *we* finally closed the bargain at $7750 and appointed a day to settle; at the settlement, when the cash instalment was paid, and the notes and receipts were given, Wm. H. H. Turner was also present in addition to the others. Being pressed as to the use of the word "them," and to state to whom he made the offer of $7000, he says, the offer was made in the presence of the three parties, and "I suppose it was to Mr. Rusk," and on cross-examination he says, "Mr. John Turner held out for more than I could have bought the stalls from Mr. Rusk for." This testimony throws a flood of light upon his mental condition as late as the year 1865. It shows that the bargain was really made with the other parties, and that these relatives were even then watching over him, and guarding and protecting him in his attempts to dispose of his property. In saying this, we must not be understood as imputing any improper conduct on their part. On the contrary, if his mind was in the condition in which we infer from the testimony it was, it was not only right but commendable in them to see that he was not cheated or overreached in his bargains. But it clearly shows he was not the man he had formerly been, and that they so thought at that time. It is hardly possible to believe, that if he was then, what all the witnesses have described him to have been before the 19th of April, he would have taken his aged mother, his young nephew, and his brother-in-law into consultation as to the sale of his *market stalls*, or would have tolerated advice from either of them, on that subject, or have suffered their interference when the bargain was made. He also had bank stock, but when it was disposed of and to whom does not appear. The rest of his real estate he seems to have sold in 1867, 1869, 1870, 1873 and 1876, during these years it is safe to infer from the testimony he had so far recovered as to be capa-

ble of contracting, though we think it clear he was never restored to his former mental vigor. The physician who examined him shortly before he testified, says his mind was not then very active or vigorous, and was certainly a little sluggish, and he died shortly thereafter.

We must now return to the deed itself, and the circumstances attending its preparation and execution. It was executed on the 27th of December, 1862, during the Christmas holidays, and in the house of his sister. It was not a *will* but an absolute *deed* taking effect immediately. Assuming he was then, as the defendants insist he was, just as capable of executing such an instrument as he ever had been, that he understood and knew perfectly well what he was doing, and also knew, as he must have known if that was his mental condition, how much he owed, and how much other property he had, what did he do? He parted at once, and for nothing with all his property, save what belonged to his creditors, and left himself absolutely penniless in the world, without a house to shelter him, or a home to go to, and dependent upon the charity of his aged mother whom he had previously supported, and of his sister to whom he had been generous and kind. For a man (such as he was) in the prime of manhood, in good physical health, and in full possession of vigorous mental faculties, to do such an act with knowledge of such possible consequences, is, to say the least, most extraordinary. It is hardly possible to characterize it as a "rational act rationally done." It is certainly not deserving the commendation given it by Mr. Robert Turner, the trustee, who says he told him on learning his intention to make this conveyance, "that it was a shrewd, wise and natural conclusion." It can be rescued from the imputation of being a most unusual, if not an insane act, only upon the theory (of which there is no proof whatever) that it was a deliberate and shallow attempt to cheat and defraud his creditors.

But what were the circumstances of its origin, preparation and execution ?   Mr. Robert Turner testifies that on one of his occasional visits to his brother's house, he found Mr. Rusk in the parlor in company with his sister, and he remarked to him, " you are looking very well, Hester must take good care of you; he smiled and said yes, that he intended to make her a present, referring to the old homestead; she remarked yes that was so, and that she intended to see her mother ; having learned the intention of his promises to her, I suggested that I had a friend who would attend to anything of the kind for her, naming the Hon. John L. Thomas, and that I could bring him over at any time he or she suggested, and he said, do so." Mrs. Turner gives substantially the same account of this interview except that she states her brother said " he felt like he wanted to provide for his mother and then for his sister." Some time after this Mr. Robert Turner brought Mr. Thomas to the house, and he testifies that he was there introduced to Mr. Rusk; had a conversation with him in relation to his property and he stated what kind of a deed he wanted prepared, and it was drawn up accordingly; that he never saw him before nor since until after the commencement of this suit.   On cross-examination he says there were present in the room at this interview which lasted for about half an hour, Mrs. Turner and her husband and Mr. Robert Turner, or some of them, and that he cannot recollect whether the conversation that then took place was entirely between himself and Mr. Rusk or not, but that he talked with him for some time.   After the deed was prepared it was brought to the house where it remained for some time and Mrs. Turner says her brother read it.   Shortly afterwards her husband called upon Mr. Hyde, a magistrate, and requested him to call at his house, which he did, and the paper was executed in the presence of Mr. Turner, and of the justice and another witness who is now dead.   The justice asked the usual question whether

he acknowledged the instrument to be his act and deed, and he said yes. What seems to us singular and unusual in all this, is the fact that while he was physically well, and nothing prevented him from going to a lawyer's office to have the deed prepared, and then to a magistrate's office to execute and acknowledge it, both the attorney and the magistrate were brought to the house where he was. But more than this, the suggestion to have an attorney brought there to carry out his promise of a present was made by another and not by himself. Again, in the interviews with Mr. Robert Turner, with Mr. Thomas, and when the paper was executed there was always some one present who was to be benefited by the deed, Mr. Thomas who was a stranger to him never saw him or attempted to converse with him when he was alone, and a close examination of this testimony shows that at these important interviews very little indeed was said by him. He seems to have merely assented to suggestions made by others, and not to have been an active and intelligent participant. In his own testimony he declares most positively he has no recollection at all of the transaction.

Two days after its execution, William H. H. Turner took the deed to the record office, and after the usual time for recording, called for and received it, and then gave it to Mrs. Barbara Rusk, the mother, who retained possession of it until her death on the 22nd of March, 1875. After this it was in the possession of Mrs. Turner or her husband at their house. The complainant lived with his mother on the property from the latter part of 1863, or the beginning of 1864, up to November, 1874, when he again went to his sister's house, where he remained until a few days before the filing of this bill. During all this period the property stood assessed to him, the bills for taxes and water rents were made out in his name, and the original policy of insurance upon it in his name, was yearly renewed without transfer, and no new or other

Turner, *et al. vs.* Rusk, *et al.*

policy was ever taken out. Neither his mother nor his sister nor her husband ever mentioned the existence of this deed to him, or claimed the property under it in his presence, and there is no proof he ever saw it or that it was kept where he could have seen or have had access to it. If, as he says, he had no recollection of ever having signed such an instrument, these facts satisfactorily explain why he remained for so long a time even after he had in a great measure recovered his reason, in ignorance of its existence, and the delay in filing the bill. Having shortly before heard in some way of a paper purporting to be executed by him, he applied immediately to Mr. William H. H. Turner, who told him if he wished to see the deed he could either go to Mr. Robert Turner or to the record office. He then immediately sought the advice of counsel, and the bill to vacate the deed was at once filed.

We have carefully examined and considered the testimony of all the witnesses on the part of the defendants, and feel compelled to say of it, that it is not sufficient to overcome the evidence and the facts adduced in support of the complainant's case. In our judgment the decided weight and preponderance of evidence sustains the position, that this party was not, at the time this deed was executed, capable of executing a valid deed or contract. The decree therefore which vacates and annuls the instrument must be affirmed.

*Decree affirmed.*

(Decided 6th February, 1880.)