# CASES

## ARGUED AND DETERMINED

#### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### MOORE et al. v. GILBERT et al.†

(Circuit Court of Appeals, Fifth Circuit. January 4, 1910.)

#### No. 1,981.

**1. CONTRACTS (§ 92*)—CAPACITY TO CONTRACT.**

In determining whether a person had capacity to make a contract, the test is whether he had sufficient capacity to understand the particular contract when he executed it.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 411–414; Dec. Dig. § 92.*]

**2. TAXATION (§ 546*)—COLLECTOR'S BOND—CAPACITY TO EXECUTE—EVIDENCE.**

Evidence *held* to require a finding that decedent had sufficient capacity to execute a sheriff and tax collector's bond when he signed it, though he was subsequently adjudged insane.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1028; Dec. Dig. § 546.*]

**3. EXECUTION (§ 256*)—SETTING ASIDE SALE—INVALIDITY OF CAUSE OF ACTION—BURDEN OF PROOF.**

In a suit to set aside a judicial sale of realty in satisfaction of a judgment on a sheriff's bond, executed by decedent, on the ground of decedent's insanity at the time he executed the bond, the burden was on complainants to show decedent's want of capacity and to rebut the presumption of capacity.

[Ed. Note.—For other cases, see Execution, Cent. Dig. § 731; Dec. Dig. § 256.*]

**4. EXECUTION (§ 245*)—SETTING ASIDE SALE—INVALIDITY OF CAUSE OF ACTION—WAIVER.**

Where, after decedent executed a sheriff's bond as surety, action was brought against him thereon, and it appeared that he was then sufficiently sane to employ counsel and intelligently defend the suit, in which he made no defense of insanity, his heirs could not set aside a judicial sale of his land in satisfaction of a judgment recovered against him on the bond, because of his insanity when he signed the bond.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 681, 682; Dec. Dig. § 245.*]

McCormick, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern District of Texas.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

175 F.—1        † Rehearing denied February 1, 1910.

Bill by F. B. Gilbert and another against W. W. Moore and others. Decree for complainants, and defendants appeal. Reversed and remanded, with instructions to dismiss.

M. A. Spoonts, Geo. Thompson, J. H. Barwise, Jr., and G. E. Hamilton (A. J. Fires and T. T. Bouldin, on the brief), for appellants.

I. W. Stephens and Geo. W. Miller, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. This is a bill by F. B. Gilbert and D. J. McDougall against W. W. Moore, T. N. Edmondson and others. The jurisdiction of the Circuit Court is shown by the diverse citizenship of the parties. The complainants (appellees here) are the heirs at law of George W. Buchanan, who, in his lifetime, owned a large tract of land in Motley county, Tex. Buchanan became a surety on the official bond of J. P. Beckham, who, in November, 1892, was elected sheriff and tax collector of that county. Beckham made default, and he, as principal, and Buchanan, as surety, were sued on the bond. Judgment was rendered against them, and execution was issued and levied on Buchanan's land, which was sold, and purchased by the defendants W. E. Gaines and T. N. Edmondson, to whom the land was conveyed by official conveyances. Gaines conveyed the section of land purchased by him at the execution sale to W. A. Carpenter, who later conveyed the same land to W. W. Moore. The bill is filed to vacate the judgment and the conveyances on the ground that Buchanan was insane when he signed Beckham's bond as surety and when judgment was rendered against him. The Circuit Court held that Buchanan was insane as alleged, and granted the relief prayed for. The defendants (appellants here) appealed to this court.

In determining the ability of an alleged insane person to make a particular contract or execute a given act, the inquiry should be: (1) What degree of mental capacity is essential to the proper execution of the act in question? and (2) whether such capacity was possessed at the time by the person alleged to be insane. The act here in question is the signing of Tax Collector Beckham's official bond as his surety. It is evident that it requires less capacity to do a simple act or make a contract involving no complications than it does to make understandingly an agreement involving complications and imposing various obligations. For that reason, a testator of weak mind might be able to make a simple will giving his property to one or more devisees, and he might not be capable of making a complicated will creating trusts, remainders, and settlements. Buchanan signed as surety a bond containing three or four short sentences, payable to the state of Texas, with condition that Beckham shall faithfully perform the duties of the office of collector of taxes. The bond is simple, containing no complicated scheme. It merely imposes on the sureties contingent liability to answer for the default of the principal. The capacity to make contracts or to become surety on a bond is not an ability to be exercised only by the wisest and shrewdest of men. Such capacity or ability may be exercised by those not gifted with great discernment or shrewdness. If a high standard of intellect or information were

required as necessary to legal capacity to make contracts, it would greatly impede the transaction of business and create endless uncertainty and difficulty. One may have but little business capacity, and a weak intellect or impaired faculties, and yet be capable of making a binding contract. No universal rule, of course, can be laid down, applicable to all cases, that would settle the validity or invalidity of a contract. But, so far from requiring a high degree of intelligence to make valid contracts, a contract will often be upheld when the degree of intelligence is very low. All that the law requires to make the contract effectual is that a man should so have possession of his reason as to know the character of the act he is about to perform and be capable of carrying that act into effect. In Mann v. Keene Guaranty Sav. Bank, 86 Fed. 51, 29 C. C. A. 547, Sanborn, Circuit Judge, speaking for the court, said:

"The question is not whether her mental powers were impaired. It is not whether or not she had ordinary capacity to do business. It is whether she had any—the smallest—capacity to understand what she was doing and to decide intelligently whether or not she would do it."

In Johnson v. Harmon, 94 U. S. 371, 379, 24 L. Ed. 271, Mr. Justice Clifford said:

"Imbecility of mind is not of itself sufficient to set aside a contract, when there is not an essential privation of the reasoning faculties, or an incapacity of understanding and acting with discretion in the ordinary affairs of life."

If Buchanan, when he signed Beckham's bond, knew what he was about, knew that he was signing a tax collector's bond as his surety, and knew the effect of his act, and had the capacity to decide whether or not he would become his surety, then he had sufficient capacity to bind himself by his act. Dennett v. Dennett, 44 N. H. 531, 84 Am. Dec. 97; West v. Russell, 48 Mich. 74, 11 N. W. 812; English v. Porter, 109 Ill. 285; Bennett v. Hibbert, 88 Iowa, 154, 55 N. W. 93; Mann v. Betterly, 21 Vt. 326.

The next question is whether Buchanan had the required degree of mental capacity at the time he signed the bond. It is important to have in view certain dates. He signed the bond December 19, 1892. He was sued on the bond, and judgment was entered November 4, 1895. He was adjudged insane, and a guardian was appointed for him December 3, 1901, 9 years, lacking 16 days, after he signed the bond. He was sent to the asylum November 17, 1902, and died there July 12, 1905. In this case we are keenly interested in Buchanan's mental condition when he signed the bond and when judgment was rendered against him on it; but his condition 5, 6, 7, 8, or 9 years after he signed the bond is a matter of no importance, unless it should throw light on his mental condition at the pivotal dates—the dates of the bond and the judgment on it.

Thirty-two witnesses were examined, 20 for the complainants and 12 for the defendants. No physician or alienist was examined. Many of the witnesses were asked substantially:

"What is your opinion as to whether he would understand the nature and effect of signing an official bond or instrument of that sort?"

Of the 20 witnesses offered by the complainants, 3 answered, in effect, that he would not understand it; 5, that he would; 8, that they did not know; and 4 made no answer, or were not asked. Of the 12 witnesses for the defendants, in response to similar questions, 9 gave it as their opinion that he would understand it; 1, that he did not know; and 2 gave no answer, or were not examined on the point. To summarize: Of the 32 witnesses in the case, 14 gave opinions in favor of his capacity, 3 against it, and 6 gave no answer, or were not examined on the point. Evidence, of course, is not weighed by counting witnesses. And it is well settled that the mere opinion of nonexpert witnesses as to one's mental capacity is not entitled to great weight, but that the court must look to the facts upon which the opinions are based. Turner v. Rusk, 53 Md. 65, 71. The varying opinions of the witnesses which we have stated were based more or less on association with Buchanan and observation of him and of his acts during a period of several years. It would be impracticable and useless to analyze the evidence of each witness, but it is evident that those who express an unfavorable opinion as to his capacity are in a measure influenced by the fact that he was declared insane in 1902. The proven facts tending to show Buchanan's insanity are mostly of occurrences happening long after he signed the bond. We attach no importance to them, because it is conceded that he was insane 9 years after he signed the bond. There are undisputed facts in the record that lead us to the conclusion that Buchanan had sufficient capacity to attend to his ordinary business and to bind himself by contracts from and including 1892, the date of the bond, to 1895, the date of the judgment against him. During that time he attended to his lands and stock. He leased his lands each year; he sold his horses for fair prices; he made trades, purchased necessary supplies, paid his debts, and became surety on other bonds; and no one at that time ever questioned his capacity to contract.

The burden of proof is on the complainants to show his want of capacity. We begin with the presumption of sanity, and while the evidence abounds with proof of eccentricity of conduct, most of it relates to a period long after the signing of the bond. The incidents proved as occurring prior to the signing of the bond, or during that year, are not sufficient to even cast doubt on his capacity to contract. Besides, the undisputed evidence of the things done by Buchanan in the conduct of his business is such as to leave no doubt in our minds that he was fully capable of making the contract of suretyship in question at the time it was made. For the years from 1891 to 1901, inclusive, he signed and verified his inventory of property for taxes, stating the acres of land and number of horses owned by him in each year, and placing different values on the horses in different years; on August 21, 1890, he executed a power of attorney to Mrs. Gilbert, one of the complainants, which was duly acknowledged and witnessed; in 1891 and 1892 he signed as surety the official bonds of Walton as county clerk, and he was accepted as surety on other official bonds as late as 1893; in 1892 he made application to purchase a section of school land in Motley county; he voted at the several elections occurring during the years in question, and was one of the officers who

held the elections in 1894 and 1896; on March 19, 1897, he made a written contract with W. R. Tilson in reference to his stock; during these years he made frequent sales of horses at fair prices; and in October, 1900, he executed a mortgage on land. Whatever witnesses may now say, these undisputed facts tend strongly to show that he was not insane in 1892, or in 1895, and that no one then thought of questioning his capacity to attend to ordinary business or to make simple contracts. After the lapse of so much time, the clearest proof should be required before the court should hold invalid the bond, the judgment on it, and the execution sales and official deeds. We are of opinion that the evidence is not sufficient to authorize such action.

There is another view of the case that leads to the same conclusion.

The bond was signed by Buchanan December 19, 1892. Primarily, the inquiry as to his mental condition and capacity to contract relates to that time. But, if the complainants successfully showed Buchanan's want of capacity to contract at the date of the bond, that would not be conclusive as to their right to relief. More than two years after the making of the bond, an action was brought on it by the state of Texas, and on November 4, 1895, judgment was entered in the suit. It was on this judgment that executions were issued and the land was sold and conveyed. The bill is an attack on the validity of the bond, judgment, and the conveyances. If Buchanan had sufficient mind to understand the effect and purpose of the suit against him, the judgment ought not to be set aside at the suit of his heirs. Spurlock v. Noe (Ky.) 43 S. W. 231. When Buchanan was sued on the bond, whatever his condition may have been when he signed it, he was sufficiently intelligent to retain, pay, and consult and advise with counsel as to his defense. The evidence of the attorney who appeared for him, and other evidence, makes it clear that he was quite capable at that time of giving the litigation proper attention. If he was insane at the time he signed the bond, that fact would have been a complete defense in the suit at law on the bond. At an early period it was held that a man could not stultify himself by alleging his lunacy at a prior time; but it is now well settled that a person who has been insane, and, when insane, makes a contract, can, on his restoration to sound mind, contest the validity of the contract. 1 Wharton & Stillé's Med. Jur. (4th Ed.) § 14; Turner v. Rusk, supra. When a surety is sued at law, and has a defense which he can make, but does not make, and judgment is rendered against him, he cannot afterwards have relief against such judgment on any ground which he might have relied on in the suit at law. 1 Brandt on Suretyship, § 244. It is clear, on principle, that he cannot go behind the judgment to set up as a matter of defense what should have been pleaded in the original action. And Brandt says:

"On the same principle, where judgment has been rendered against a surety on an appeal bond, it was held that the administrator could not set up as a defense the fact that the surety was insane when he assumed the liability sought to be enforced." 2 Brandt on Suretyship (2d Ed.) § 460.

The case of Rollins v. Love, 97 N. C. 210, 2 S. E. 166, cited by Brandt as sustaining this last view, is not in point; but the principle announced in the text is unquestionably correct, and is fully sustained by the authorities. 2 Freeman on Judgments (4th Ed.) § 502; 1 Black

on Judgments, § 378; New Orleans v. Morris, 3 Woods, 103, Fed. Cas. No. 10,182; Life Insurance Co. v. Bangs, 103 U. S. 780, 26 L. Ed. 608.

The decree of the Circuit Court is reversed, and the cause remanded, with instructions to dismiss the bill.

McCORMICK, Circuit Judge. I cannot concur in this decision. The evidence in the case impressed me very differently from the way it has appeared to my Brethren. I am decided in my conviction that the decree of the Circuit Court should be affirmed.